Argued June 23; affirmed October 20, 1931; rehearing denied
January 12; second petition for rehearing denied February 9, 1932

# STATE *v.* BOLOFF

(4 P. (2d) 326, 7 P. (2d) 775)

*Irvin Goodman*, of Portland, for appellant.

*Lotus L. Langley*, District Attorney, and *Ben Conn*, Deputy District Attorney, both of Portland (J. Mason Dillard, on the brief), for the State.

ROSSMAN, J. Since a consideration of the assignments of error will be greatly facilitated through an understanding of the evidence presented by the State, we deem it advisable to set forth the following resume of the principal features developed by the State's evidence. We precede this review with a statement that during the interrogation of the veniremen and during the examination of the State's witnesses, the defendant's attorney voluntarily and freely conceded the defendant's membership in the Communist party, and that he joined the party in Oregon. As a witness in his own behalf, the defendant admitted his membership.

One M. R. Bacon, a police officer in the employ of the city of Portland, testified that for the purpose of gaining information as to the nature and activities of the Communist party, he joined the Portland unit of it March 15, 1930, and was thereafter elected to various offices in the party and its subsidiaries, including a position as secretary and also as a delegate to its Northwest convention held in Seattle, and to its Pacific Coast convention in San Francisco. From his testimony it appeared that the Communist party in the United States has organized this country into more than 20 districts of which Oregon, Washington, and Alaska comprise the twelfth, with headquarters in Seattle. National headquarters are maintained in New York. The Communist party of the United States is a subsidiary of an international organization whose headquarters are in Moscow, Russia. The main program followed by the Communist party of the United States originates in Moscow, and is sent to the Communist party of this country from the Communist International by "thesis and resolutions." The Portland unit, with a membership of approximately 50 listed individuals who pay dues, maintains headquar-

ters at Room 312, Worcester building, where a supply of literature is maintained for sale and distribution. It also has an "underground membership" whose number is unknown to Bacon. The aforementioned room also constitutes the regular meeting place for the Portland membership. Upon its wall is displayed a large red flag bearing the symbols—a scythe and hammer—of Soviet Russia. According to Bacon, Communist party newspapers have a circulation of approximately 250,-000 copies in the United States.

Bacon testified that one who desires to join the party is required to sign an application wherein he subscribes to its principles. When his application has been received he is required to return a registration form bearing such information concerning himself as is desired by the local unit. All applicants are required to pledge adherence to the program and statutes of the party and to promise to engage in all of its activities. Bacon testified that no membership card is issued until the officials of the party have become convinced of the applicant's sincerity and good faith. At the time of the defendant's arrest there was taken from his person his membership booklet issued to him by the Communist party in which was recited the fact that he was a member of that organization, having been admitted to membership in January of 1924. Beside this entry was another which stated that he had "entered revolutionary movement, 1922." Upon pages specially provided and headed with the words "Membership Dues for 1930" are 33 dues stamps. Four of these, in the denomination of 50 cents, are marked "8/29, E. N." A later page, headed with the words "Assessment stamps," contains one stamp of the denomination of $1, entitled "7th Convention of the Communist Party of the U. S. A.", and is marked "5/30/30, L. M." In

the booklet, which is of a size appropriate for a vest pocket, are five pages entitled "Extracts from the Statutes of the Communist Party of the U. S. A." Omitting parts, we quote from these the following:

"§ 3—Membership.

"1. A member of the Party can be every person from the age of eighteen up who accepts the program and statutes of the Communist International and the Communist Party of the U. S. A., who becomes a member of a basic organization of the Party, who is active in this organization, who subordinates himself to all decisions of the Comintern and of the Party, and regularly pays his membership dues. * * *

"§ 4—Structure of the Party.

"1. The Communist Party, like all sections of the Comintern, is built upon the principle of democratic centralization. These principles are: * * * (c) Acceptance and carrying out of the decisions of the higher Party committees by the lower, strict Party discipline, and immediate and exact applications of the decisions of the Executive Committee of the Communist International and of the Central Committee of the Party. * * * (e) The discussion on basic Party questions or general Party lines can be carried on by the members only until the Central Committee has decided them. After a decision has been adopted at the congress of the Comintern, the Party convention, or by the leading Party committee, it must be carried out unconditionally, even if some of the members or some of the local organizations are not in agreement with the decision. * * *

"§ 12—Party Discipline.

"1. The strictest Party discipline is the most solemn duty of all Party members and all Party organizations. The decisions of the CI and the Party Convention, of the CC and of all leading committees of the Party, must be promptly carried out. Discussion of questions over which there have been differences must not continue after the decision has been made."

The above extracts of ''statutes'' are succeeded by the following:

''What is the Communist Party?

''The Party is the vanguard of the working class and consists of the best, most class conscious, most active, the most courageous members of that class. It incorporates the whole body of experience of the proletarian struggle, basing itself upon the revolutionary theory of Marxism and representing the general and lasting interests of the whole of the working class, the Party personifies the unity of proletarian principles, of proletarian will and of proletarian revolutionary action. (From the program of the Communist International.)

''We are the Party of the working class. Consequently, nearly the whole of that class (in time of war and civil war, the whole of that class) should work under the guidance of our Party, should create the closest contacts with our Party. (LENIN.)

''On Discipline.

''He who weakens, no matter how little, the iron discipline of the Party of the proletariat (especially during the period of dictatorship), effectually helps the bourgeoisie against the proletariat. (LENIN.)''

Bacon testified that August 29, 1930, at Room 312, Worcester building, a meeting of the local unit was held which was attended by the defendant. It will be recalled that Boloff's membership book records his purchase of four 50-cent stamps August 29, 1930. Bacon testified:

''That meeting was called to select speakers and to appoint members of the Party to take charge of a demonstration, proposed demonstration, to be held under the auspices of the Trade Union—Unemployed Council of the Trade Union Unity League for September 1st, and to see that a defense corps was organized; that was a part of the instructions, or to protect

the speakers at the meetings to be held at the Plaza Blocks on September 1st. * * * All Party members were requested to be present and be active in distributing leaflets for that demonstration and to be at the demonstration, to support the speakers and to protect them from police interference in case attempts were made to arrest their speakers.''

He added that instructions were given to forcibly resist any officer who attempted to interfere with the demonstration.

The same witness swore that the policies and principles advocated by the Communist party were the following:

''They advocate the overthrow of the Government, of our Government—that is, the Government of the United States of America, and all other Governments, that are not Soviet, by revolution, and that is—the principle is advocated at practically all of their meetings. * * * By organizing the workers, as they term them, into the Communist Party and the enlisting in the Army and Navy and teaching soldiers in the Army and sailors in the Navy to turn their guns against their officers, and to destroy them, and to annihilate the Government for the purpose of setting up a Soviet Government, and several times, for instance, in the Party headquarters they make statements many times like this: I remember one time particularly that one of the members by the name of Sanderstrom said, 'We will take all of these capitalists and we will line them up against the wall and shoot them and use their bones for fertilizer,' and they actually believed that was the right and proper thing to do. They advocate arming the workers, the working people, for the purpose of destroying the Government. I have heard at meetings on the street—heard that at meetings on the street. * * * In July, 1930, one of the speakers, by the name of O'Hanrahan was speaking on Main Street, between Third and Fourth, and he said, 'We tell you workers that you have got to destroy capitalism and we tell

you that you have got to take your guns and go out and shoot down the bosses. They use their army and they use their police force against you, and we organize you into the Communist Party for the purpose of destroying them and setting up a workers' and farmers' government. We will take over all the factories and the mills and it can not be done in any other way.' The first of June, 1930, on the corner of Fourth and Burnside, Fred Walker was speaking under the auspices of the Communist Party, and stated that we—'Do we believe in revolution?' He said, 'Yes, we believe in revolution; we teach you that you must arm yourselves; you must go out here and destroy capitalism by arming yourselves and fighting the Government; that you must destroy the Government, and that is direct action and we believe in direct action.' At another time, on the corner of Fourth and Burnside, a speaker by the name of J. W. Johnson was speaking under the auspices of the Communist Party and was answering questions. A question was asked him, 'What method will the Communist Party use to bring about the revolution?' In answer to that question, he says, 'I will answer that question, but,' he says, 'Before I answer it,' he says, 'I want you to know that the jail doors swing open for me.' He says, 'The Government uses force, uses their Army, their militia and their police against you, and we teach you that you will have to use the same force against them to destroy them, in order that you might have a Communist Party, a Communist Society, but you must first set up a Soviet Government.' At another meeting held in September, at 312 Worcester Building, a speaker by the name of Kline, Paul Kline, was speaking, and in urging those present to join the Communist Party, he said, 'We do not teach you that you can peaceably take over the government; we enter election campaigns, but not for the purpose of acquiring power. We tell you that you can not acquire power by means of ballots; that it must be done by bullets, and that the revolution will be accomplished by the bullet box and not by the ballot box.' "

The witness added:

"An average of twice a week, meetings were held on the street in Portland, from March, the latter part of March, until September, and revolution was advocated in a more or less degree at all of these meetings."

He felt quite certain that Boloff attended at least one of these meetings.

The witness testified that, at the district convention which he attended as an elected delegate,

"We were instructed that we must concentrate upon the organizing in the different shops, mills, and factories, for the purpose of having control of those factories and mills and shops, so that in the event of revolution, or in the event of war, materialists' war, as they call it, that is, from one capitalist nation, as they term it, to another, that sabotage, the preventing of the transporting and manufacture of products necessary for the carrying on of that war, could be done; that they would have control of those industries, and we were further instructed that we must bring into the Party young comrades, young men that were native-born."

He further testified:

"The Communist Party urges very strongly that agitation be carried on within the armed forces of the United States, both the Army and the Navy and the Militia, for the purpose of getting control of the soldiers, the men in those organizations, and they say, 'We tell them, we must tell them that instead of fighting for the bosses, for their Government, that they must turn their guns against their Government and against their officers, and go over to the side of the revolution. That during revolution—or that during invasion or war between the Soviet Union and the United States, we will not tell them to use their guns or to run away, to throw their guns away and desert, but we tell them to keep their guns and with as much ammunition as they can get, to go over to the side of the Red Army and fight against their own Army.'"

After Bacon had recited the names of several books, leaflets, newspapers, and other publications which were distributed free or were purchasable at local headquarters, 312 Worcester building, he testified that all of the members were urged to read and to study these publications. Several of them were introduced in evidence from time to time, all without objection from the defendant; in fact, with his express approval. One of these booklets is entitled, "The A. B. C. of Communism." The following excerpts are taken from that publication:

"The fight, under such conditions, must end in victory for the working class. Sooner or later there is bound to be a collision between bourgeoisie and proletariat. The bourgeoisie will be hurled from their present commanding position; the proletariat will destroy the robber State and establish in its stead a Communist society of workers. The development of Capitalism, therefore, leads inevitably to the Communist revolution of the Proletariat. * * * It goes without saying that the bourgeoisie will not surrender their position without a fight. * * * The State is an organization. The bourgeois State is a bourgeois organization in which each minister the affairs of the army; and above these are Ministers drawn from the ranks of the rich classes, and so on. When the proletariat fight to acquire power, against what do they fight? Against the bourgeois organization in the first place. When they fight this organization their problem consists in finding that part of their enemy's defenses where their blows will take most effect. But as the chief power of the State lies in the Army, it is necessary, above all things, to undermine and destroy the Army in order to overcome the bourgeoisie. * * * The Army, which marches against the workers at the order of the generals of the bourgeoisie, must be destroyed, even if the last of our countrymen are killed in the process. The revolution means death to them in any case. We have

therefore nothing to fear from the destruction of the bourgeois army; and a revolutionary must account it a gain to have destroyed the State apparatus of the bourgeoisie. * * * To say that the revolution can be achieved without civil war is to say that a 'peaceful' revolution is possible. Those who believe in the possibility of a 'peaceful' revolution, for example, the Mensheviks, who cry out against the waste of civil war, turn from Marx to the pre-scientific Socialists who believe that it is possible to 'convert' the capitalists. As well believe that a tiger can be coaxed into feeding on grass and allowing calves to live in peace. Marx was a believer in civil war—that is, the armed struggle of the proletariat against the bourgeoisie. * * * The victory of the proletarian dictatorship can not be achieved without loss and suffering. The civil war, like every other war, demands sacrifices of men and materials. Such sacrifices are inseparable from any revolution. The best of the workers, instead of attending to their work and organizing production, will have to shoulder their rifles and go to the front to defend themselves against the landowners and militarists. Industry will naturally suffer from this. * * * Marx discoursed on that subject in the 'Communist Manifesto' which closes with these words: 'The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of the present system of society. Let the ruling classes tremble before a Communistic Revolution. The proletarians have nothing to lose but their chains. They have a world to win. Proletarians of all lands, unite!' * * * The proletariat must take a lesson from the bourgeoisie: they must destroy the bourgeois Fatherland, and not defend it or help to extend it; and they must defend their own proletarian Fatherland with all their strength, and to the last drop of their blood. * * * That is the danger to the proletariat which lies in the watchword of pacifism. The aim of pacifism is to turn the working class away from the armed fight for Communism.' "

582

From "Communist International," another of the above mentioned publications, we quote:

"The conquest of power by the proletariat does not mean peacefully 'capturing' the ready-made bourgeois State machinery by means of a parliamentary majority. The bourgeoisie resorts to every means of violence and terror to safeguard and strengthen its predatory property and its political domination. * * * Hence, the violence of the bourgeoisie can be suppressed only by the stern violence of the proletariat. The conquest of power by the proletariat is the violent overthrow of bourgeois power, the destruction of the capitalistic State apparatus (bourgeois armies, police, bureaucratic hierarchy, the judiciary, parliaments, etc.) and substituting in its place new organs of proletarian power, to serve primarily as instruments for the suppression of the exploiters. * * * When the revolutionary tide is rising, when the ruling classes are disorganized, the masses are in a state of revolutionary ferment, the intermediary strata are inclining towards the proletariat and the masses are ready for action and for sacrifice, the Party of the proletariat is confronted with the task of leading the masses to a direct attack upon the bourgeois State. This it does by carrying on propaganda in favor of increasingly radical transitional slogans (for Soviets, workers' control of industry, for peasant committees for the seizure of the big landed properties, for disarming the bourgeoisie and arming the proletariat, etc.). * * * This mass action includes: a combination of and demonstrations; a combination of strikes and armed demonstrations and finally, the general strike conjointly. * * * The Communists disdain to conceal their views and aims. They openly declare that their aims can be attained only by the forcible overthrow of all the existing social conditions. Let the ruling class tremble at a Communistic revolution."

From "The State and Revolution," another of the above mentioned publications, we quote:

"We have already said above and shall show more fully at a later stage that the teaching of Marx and

Engels regarding the inevitability of a violent revolution refers to the capitalist State. It can not be replaced by the proletarian State (the dictatorship of the proletariat) through mere 'withering away', but, in accordance with the general rule, can only be brought about by a violent revolution. * * * The substitution of a proletarian for the capitalist State is impossible without violent revolution. * * * All former revolutions helped to perfect the machinery of Government, whereas now we must shatter it, break it to pieces. * * * Such a course of events compels the revolution 'to concentrate all the forces of destruction' against the State, and to regard the problem as one not of perfecting the machinery of the State, but of breaking up and annihilating it. * * * We have but to overthrow the capitalists, to crush with the iron hand of the armed workers the resistance of these exploiters, to break the bureaucratic machine of the modern State—and we have before us a highly technically-fashioned machine freed of its parasites, which can quite well be set going by the united workers themselves, hiring their own technical advisers, their own inspectors, their own clerks, and paying them all, as, indeed, every 'State' official, with the usual workers' wage. * * * With such an economic groundwork it is quite possible, immediately, within twenty-four hours, to pass to the overthrow of the capitalists and bureaucrats, and to replace them, in the control of production and distribution, in the business of apportioning labor and products, by armed workers, or the people in arms. * * * Until the entire State organization is destroyed, the struggle will not end. That is its aim. * * * The Marxists recognize that when once the proletariat has won political power it must utterly break up the old machinery of the State, and substitute for it a new machinery of organized armed workers, after the type of the Commune. * * * The essence of revolution is not that a new class shall govern by means of the old governmental machinery, but that it shall smash up this machinery and govern by means of a new machine. * * * We are working

for a complete destruction of the old machinery of government, in such a way that the armed workers themselves shall be the government, which will be a very different thing.''

From the ''Communist Manifesto'', another of the above mentioned manuscripts, we quote:

''The Communist revolution is the most radical rupture with traditional property-relations; no wonder that its development involves the most radical rupture with traditional ideas. * * * In short, the Communists everywhere support every revolutionary movement against the existing social and political order of things.''

From '' 'Left' Communism'', another of the above publications, we quote:

''Undoubtedly, the leaders of opportunism will have recourse to all the tricks of bourgeois diplomacy, will appeal to the help of bourgeois governments, to priests, police, courts, in order to prevent Communists from entering the Trade Unions, by all and every means to put them out, to make their work inside these organizations as unpleasant as possible, to insult, hound and persecute them. It is necessary to be able to withstand all this, to go the whole length of any sacrifice, if needbe, to resort to strategy and adroitness, illegal proceedings, reticence and subterfuge, to anything in order to penetrate into the Trade Unions, remain in them, and carry on Communist work inside them, at any cost. * * * But those who can not coordinate illegal forms of the struggle with legal ones are very poor Revolutionists. It is not at all difficult to be a good Revolutionist once the Revolution has broken out—when all and everyone joins the Revolution from mere enthusiasm, because it is the fashion. * * * It costs the proletariat labor, great labor, and I may say excruciating pains, after the victory to rid itself of these pseudo-Revolutionists. But it is far more difficult, and yet more valuable, to know how to be a Revolutionist, even when conditions are yet lacking

for direct, general, truly mass and truly revolutionary action; to be able to defend the interests of the Revolution by propaganda, agitation and organization, in non-revolutionary institutions and oftentimes in downright reactionary surroundings, among masses incapable of immediately understanding the necessity for revolutionary methods. To be able to find, to sense, to determine the concrete plan of still incomplete revolutionary methods and measures, leading the masses to the real, decisive, final, great revolutionary struggle—this is the chief problem of modern Communism in Western Europe and America.''

From ''The Communist Nucleus,'' another of the aforementioned publications, we quote:

''Our Party is a militant organization of the working class, and it is our aim that in each shop, factory, large store, etc., a Communist nucleus should be established that will consist of the most conscious vanguard devoted to the proletarian revolution. * * * We repeat that to win over the toiling youth and not to permit the bourgeoisie and its lackeys (from priests to 'socialists') to poison their understanding with chauvinistic, religious or reformist nonsense, to organize them as a squad in the proletarian revolutionary army is the joint task of the Y W L and the Party.''

From the July, 1929, issue of ''The Communist,'' another of the aforementioned publications, we quote:

''We do not indulge in the social-democratic twaddle about disarmament. We will not tell the soldiers in the army to throw away their guns and run home. We tell them to hold their guns in their hands and use them against their own capitalist oppressors. When faced with an imperialist war as an accomplished fact we must be able to popularize definite revolutionary slogans among the armed forces. In ,case of a war between imperialist nations we raise the slogan of fraternization with the soldiers of the opposing army, refusal to obey commands of officers, mutinies, and other forms of disruptive work. In case of a war

against the Soviet Union our main slogan will be different. We will then urge the soldiers in the imperialist armies to desert the army and with their guns and as much ammunition as they can get, go over to the side of the Red Army against the imperialist forces. While the capitalists prepare for another imperialist war, we prepare to utilize the difficulties for capitalism arising out of such a war in order to initiate the next stage of the world revolution. We realize that such a conflict requires careful preparation under the leadership of a determined Bolshevik party.''

From the March, 1929, issue of ''The Communist,'' we quote:

''The dictatorship of the proletariat is a resolute, persistent struggle, sanguinary and bloodless, violent and peaceful, military and economic, pedagogical and administrative, against the forces and traditions of the old society. The force of habit of the millions and tens of millions is a formidable force. Without a party of iron-tempered strength, without a party possessing the confidence of all that is honest in the given class, without a party capable of observing the disposition of the masses and of influencing them, the conduct of such a struggle is impossible. To defeat the great centralized bourgeoisie is a thousand times easier than to defeat 'millions and millions of small owners (bosses) who in their daily imperceptible, intangible but democratizing activities achieve the very results desired by the bourgeoisie, which restore the bourgeoisie. Whoever in the least weakens the iron discipline of the Party of the proletariat (especially during its dictatorship) aids in fact the bourgeoisie against the proletariat.''

From ''The Communist International,'' one more of the above publications, we quote:

''Most serious attention should be paid to the practical side when organizing strikes; even the most trivial detail should not be neglected, as, with the ruling classes highly organized as they are, we can not or-

ganize strikes by agitation alone; a most thorough, persistent and all-round preparation is therefore necessary. The chief factors in this activity should be * * *. In the present stage of the international labor movement, strikes should infallibly be accompanied and supplemented by demonstrations which include the unemployed workers. The ruling classes are reacting to working-class revolutionary demonstrations with increasing nervousness. They are resorting more and more frequently to mass arrests, baton charges, and shooting. For the time being, the proletariat is not yet able to undertake the task of an armed struggle for the streets. But this by no means signifies that the workers should quit the streets under pressure of the armed forces of the ruling classes. * * * Powerful revolutionary demonstrations repulsing the police oppression, undismayed by the laws of the bourgeois state, should act as a stern warning against the war plans of the bourgeoisie. During the previous two campaigns the workers created the following main forms of preparation for the demonstration: * * * (3) As a rule the demonstrators should rally outside their own factory; (4) Each group of demonstrators should have its own (factory) defense force; (5) The defense corps should also take steps to hold up and disorganize the movement of police automobiles; (6) Demonstrators as a rule should avoid collisions with big forces of police and should disperse as they approach, and assemble in another place; small police detachments should not be allowed to hold up demonstrations; (7) Preparations for the demonstrations should be accompanied by intensive propaganda work among policemen and their families. * * * August 1st and March 6th aroused the whole capitalist state apparatus to action. The capitalist world must be shaken still more thoroughly by the political strikes and demonstrations of the First of May, 1930. This May Day should be marked by the conquest of the streets by the workers; should challenge the threats of capitalist terror; and should deal a forceful blow at the main stronghold of capitalism—international

social-fascism. If the First of May demonstrations achieve these results—and the Communist Parties should strive for this with all their strength—then May the First, 1930, will go down as an important step forward in the development of the working-class offensive—in the fight against capitalist wage attacks, against imperialist wars, and in support of the U. S. S. R.''

Bacon testified that the Communist party teaches the working men to organize the employees in the shops and factories, especially in the key industries, so that the party may be able to control such industries and be able to stop production in the event of a war between this country and the Soviet Union. He added that the membership was taught to cripple an industry by the use of sabotage in the event of a strike. The witness further testified:

''The policy of street demonstrations was to hold demonstrations, and if possible to have any fights with police—for instance, on our demonstration that was held here by the Communist Party on May 1, 1930, I was elected as a member of the bail committee, a committee of one, to keep out of the demonstration. In case any of the members were arrested, it was my duty to see that they were bailed out. * * *''

The witness testified that the party expects the arrival of the revolution at the following time:

''The Communist Party teaches that they must conduct an economic war, and that when enough workers get out of work and are hungry, by reason of the upset of economic conditions, that they are ripe for organization and are willing to fight, and they have no set time that I know of for the final end—the bringing about of the final part of their revolution. They claim that the revolution, of course, is being accomplished, is working out towards bringing about the violent overthrow, which is the final stage of revolution. * * *''

The witness added that the party in expectation of the near approach of the violent conflict advocates the arming of working men thus:

"They speak of the people of the armed revolution, and they have stated at different times—for instance, in July, one of the speakers, J. W. Johnson, was a speaker at Fourth and Burnside, and he stated that 'You won't have to worry about arms and to worry about getting the guns, about where to get the guns, when the time comes for a revolution.' He says, 'There will be plenty of guns for you and there will be plenty of ammunition, and all you got to do is to organize into the Communist Party and you won't have to worry about where the arms come from. You will have plenty of them. They will be furnished you.''

W. B. Odale, a member of the Portland police department, testified that he heard Moore, Walker, Levitt, and Johnson, all of whom had been identified by Bacon as members of the Communist party, authorized to speak in its behalf, deliver speeches in public places in the city of Portland in 1930, and that all of them urged the working men in their audiences to join the Communist party in support of the revolutionary movement. He further testified that in some of these speeches the speaker declared that the contemplated revolution could not be achieved without the use of violence.

Mr. Raphael P. Bonham, district director, United States Immigration Service, testified that he was familiar with the doctrines of the Communist party, which fact the defendant conceded. Without objection from the defendant, the witness testified that the Communist party advocated a revolutionary change in the form of the government of the United States "by an armed revolution." He added:

"It is their theory that the only way that the dictatorship of the proletariat can be established is by

the abolishment of the capitalist system, and that the capitalist system and the Government is one, and therefore to reach the capitalists, so-called, they must destroy the Government, and the only way that the Government can be conquered and destroyed is by an armed uprising, a revolution. * * * Their plan is to organize the workers, so-called, and their sympathizers, and to teach them the theory of the organization, so that they may be better revolutionists, to put them into all the war-essential industries, into the American Army and Navy, into the National Guards, into every industry essential to the successful carrying out of war, and then at the opportune time, to turn upon their own government and seize the reins of government."

Further, he swore that the Communists advocate the use of street meetings as a means of solidifying the working class in opposition to the Government and believe that the demonstrations and strikes will grow in intensity until they finally develop the longed-for revolution. He added that the party advocates resistance to peace officers. He further testified that the Communist party aims "to bring about an armed revolution at the very first opportunity." Upon cross-examination, Bonham mentioned a large number of Communist publications which he had purchased at Communist party headquarters, and, being further pressed, read extracts from them. We shall not quote these extracts since their substance is not substantially different from the preceding quotations, except the following, taken from "The Sharpening of Imperialist Antagonisms": "An oppressed class that does not endeavor to possess arms and to learn to use them, would deserve to be treated as slaves." From "The International Labor Unions" he read:

"In this connection, it is important to keep in mind that the development of class consciousness among the workers is inseparable from the understanding that

capitalism and the capitalist state are an identity, and that struggle against capitalism must, of necessity, be struggle against the capitalist state.''

From ''The Platform of the Class Struggle'' he read:

''The Young Communist League does not limits its activity to the framework of 'legality' ordained by the bourgeoisie. In its struggle against capitalism, the Young Communist League is continually compelled to combine its open legal activity with illegal and semi-legal work. * * * The work in the armed forces, which is a major task, must be extended and placed on a permanent basis. The program of soldiers' and sailors' demands must be improved so that it will really express their daily needs. Special activity must be carried on among the young workers in war industries, navy yards, ammunition centers, chemical plants and ports. The work in the C. M. T. C., other militarist and semi-militarist organizations, must be intensified.''

The witness brought to a close his reading of excerpts from the various publications with the declaration that none of the Communist literature advocates a revolution by ballot, but always ''by bullet.''

■ The first assignment of error challenges a ruling of the Circuit Court which overruled the defendant's objections to an inquiry propounded to the aforementioned Odale, a witness for the State, concerning the substance of a speech delivered by the aforementioned Levitt in the Plaza blocks of Portland in August of 1930. Levitt, as we have already mentioned, had been described by Bacon as a member of the Communist party, authorized by it to speak in its behalf. The defendant objected to the portion of Odale's testimony wherein he stated (concerning Levitt's speech): ''In response to questions as to how the revolution would be accomplished, Levitt said it would have to be accomplished by the use of—by the usual means of warfare.''

The purpose to which the State applied the challenged testimony was to establish its contention that the Communist party was a society which taught and advocated criminal syndicalism and the propriety of committing acts of physical violence as a means of accomplishing industrial-political ends and a revolution in the structure of our government.

Disposing of this assignment of error, it will be observed that Bacon, Odale, and Bonham had testified, without objection, to the substance of many other speeches made by speakers authorized to speak on behalf of the Communist party. Bacon told of having heard O'Hanrahan, Walker, Johnson, Kline, and others address assemblies of people in Portland, declaring that a revolution was in the offing, and that the working class must use armed violence to bring about a successful conclusion. He also testified that he heard a speaker on behalf of the Communist party declare: "You won't have to worry about arms. * * * There will be plenty of guns for you and there will be plenty of ammunition. * * * They will be furnished you." Bonham testified that he had heard several Communist speakers advocate revolution and mention violence in connection with it. Odale, before quoting from Levitt, gave the substance of two or three other inflammatory speeches made by the Communist speakers which he had heard. All of this testimony was received without objection of any sort from the defendant. It will also be observed that Levitt's remarks, as repeated by Odale, were very similar to the paragraphs taken from Communistic literature which we have quoted. In fact, the literature advocated the contemplated revolution in terms more violent than the language used by Levitt, and was far more specific in its

reference to physical violence than was Levitt's language. It will also be recalled that a supply of this literature was maintained at Communist party headquarters in Portland and was sold or distributed at that place and at street gatherings. It will be further recalled that all of this literature was received in evidence without any objections whatever from the defendant; in fact, in many instances the defendant invited or encouraged the receipt of this evidence. There can be no question of the competency of this proof, and of the court's right to use it for the purpose of determining the character of the organization of which the defendant was a member: *State v. Laundy,* 103 Or. 443 (204 P. 958, 206 P. 290); *State v. Pettilla,* 116 Wash. 589 (200 P. 332); *State v. Lowery,* 104 Wash. 520 (177 P. 356). From the latter case, we quote:

"The defendant next complains that the court erred in receiving evidence tending to sustain the recitals in the information. This complaint is directed to some twenty-six exhibits offered and received in evidence over the defendant's objection. They consist of various written propaganda issued by the Industrial Workers of the World, much of which is inflammatory in character, and some of which had been taken from the person of the defendant at the time of his arrest. All these documents were sufficiently proven to have been issued under the authority of the Industrial Workers of the World, and were admissible for the purpose of showing the aims, objects and methods of that organization, and to prove the assertion that the organization was bent on forcibly, violently and anarchistically overturning and overthrowing the government of the United States. This was all admissible against the defendant, there having been introduced evidence sufficient to go to the jury establishing that the defendant himself was not only associated with, but was a member of such organization. The defendant claims that he is not responsible for the recitals contained in the

exhibits. That is beside the question, because the defendant made these doctrines his own by accepting membership in the organization by which they were promulgated, and an exposition of whose principles they represent. They were also admissible on the theory that they were declarations of co-conspirators engaged with the defendant in the furtherance of an unlawful purpose.''

██ In determining whether the court erred in the reception of the challenged testimony, the familiar rule governing the effect of alleged error comes to mind, that is, the admission of objectionable evidence is not cause for reversal where substantially the same evidence has been previously received without objection (*Tyler v. Moore,* 111 Or. 499 (226 P. 443); *Meier & Frank Co. v. Mitlehner,* 75 Or. 331 (146 P. 796); *Blue v. Portland Railway Light & Power Co.,* 60 Or. 122 (117 P. 1094); or where the fact involved has been previously fully established by other evidence which is competent (*Reid v. Yellow Cab Co.,* 131 Or. 27 (279 P. 635, 67 A. L. R. 1); *L. B. Menefee Lumber Co. v. MacDonald,* 122 Or. 579 (260 P. 444); *Meridinial Co. v. Moeck,* 121 Or. 133 (253 P. 525); *State v. White,* 48 Or. 416 (87 P. 137); *Siglin v. Coos Bay Co.,* 35 Or. 79 (56 P. 1011, 76 Am. St. Rep. 463); or if the fact involved has already been established by competent evidence and the challenged evidence is only cumulative in character; *Christensen v. Reid,* 116 Or. 554 (240 P. 1113, 241 P. 1009); *Smith v. National Surety Co.,* 77 Or. 17 (149 P. 1040). See generally 4 C. J., Appeal and Error, §§ 2954, 2955 and 2956.

██ If we should concede that the challenged testimony was inadmissible it would necessarily follow from the application of the above rule that no prejudicial error was committed when defendant's objection was

overruled, but we do not believe that the evidence was inadmissible. The statute which the State contended the defendant had violated provides:

"Any person * * * who shall be or become a member of, or organize or help to organize, or solicit or accept any person to become a member of, or voluntarily assemble with any society or assemblage of persons which teaches, advocates, or affirmatively suggests the doctrine of criminal syndicalism, sabotage, or the necessity, propriety or expediency of doing any act of physical violence or the commission of any crime or unlawful act as a means of accomplishing or effecting any industrial or political ends, change or revolution or for profit, is guilty of * * *." (§14-3,112, Oregon Code 1930.)

We quote from *State v. Pettilla,* 116 Wash. 589 (200 P. 332), wherein the court passed upon a similar objection in a case based upon Washington's criminal syndicalism statute:

"The rule is: * * * that witnesses may testify as to statements and speeches and declarations made by members of the organization, or in their presence, at recognized meetings of the organization or assemblages of the organization in their various headquarters or halls, or in such places and on such occasions as are proven to have received the sanction and countenance of the organization, and that the witnesses may also testify as to conversations in which are revealed the principles and teachings, the purposes and objects of the organization, with members of the organization whose membership is shown by competent testimony, and whose membership is proven to be of such a character as to show it carried with it the authority of the organization to make such declarations as to its purposes, objects, principles and teachings."

No one contended that Levitt was not an authorized speaker for the Communist party.

■ Laws such as the above partake of the nature of criminal conspiracy statutes: *Whitney v. California,* 274 U. S. 357 (47 S. Ct. 641, 71 L. Ed. 1095); *State v. Lowery,* 104 Wash. 520 (177 P. 355). The effect of one's entry into a conspiracy is to make the acts and the declarations of his associates, while engaged in the furtherance or execution of the common design, his own acts and words even though he was unaware of the identity of the co-conspirator who actually performed the desired act or uttered the necessary declaration: *Spies v. The People,* 122 Ill. 1 (12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320); *State v. Milo,* 126 Or. 238 (269 P. 225); *State v. Lewis,* 51 Or. 467 (94 P. 831); *State v. Ryan,* 47 Or. 338 (82 P. 703, 1 L. R. A. (N. S.) 862); § 9-226, subd. 6, Oregon Code 1930; and *State v. Lowery,* supra.

■ The rule just stated can be readily applied to the case at bar. It will be observed from the evidence which we have quoted that the question propounded to Odale, and to which the defendant objected, was preceded by other evidence which showed that the defendant had voluntarily become a member of the Communist party in 1924; that his membership card stated that he had joined the revolutionary movement in 1922; that the same card contained excerpts from the statutes of the party declaring that the organization is of a revolutionary character; that each member of it must submit himself without reserve to the will of the organization, and especially to that of the ruling committees, so that the common goal could be achieved; that in the hall where the local unit met a large red flag of a character commonly regarded as signifying revolutionary purposes was prominently displayed; that August 29, 1930, at a meeting held in that room,

with the defendant present, plans were made for a demonstration upon the streets of Portland and provision was made for overcoming anticipated police interference; that at the aforementioned place a variety of Communist literature was kept, sold, and distributed; that this literature was intended to foment revolution in the social, economic, and legal structure of our country; that the literature advocated the use of physical violence; and that several members of the party who were authorized to speak in its behalf made similar declarations in the above described meeting hall, and in addressing their audiences in public places in Portland. The above evidence warrants a conclusion that when Boloff joined the above organization he became a member of an illegal enterprise which was seeking to achieve unlawful purposes in unlawful ways through the joint efforts of the entire membership. (Compare *Whitney v. California,* supra, *State v. Lowery,* supra, and *State v . Laundy,* 103 Or.443 (204 P.958, 206 P. 290). The organization which he joined was, in fact, a conspiracy with a nation-wide membership. Different duties were assigned to the individual members; some contributed dues; others schemed and planned; some exhorted the membership; some addressed public gatherings; others edited Communistic publications; others distributed the literature, etc. From time to time all were expected to join in street demonstrations, foment strikes, and in other manners create dissatisfaction among working men, strife between employer and employee, and to induce the thought in the minds of employees that the government is the instrumentality of the "capitalist class"—the alter ego of "the bosses."

■ The plan further contemplated that the dissatisfaction and hate created would develop a condition pro-

pitious for revolution. At the opportune moment the revolution was to be called into effect just like Spies and his associates in *Spies v. The People,* supra, expected to usher in their revolution by publishing the magic word "Ruhe" in the Arbeiter-Zeitung. The law, as we have seen, is well established that when men join such an organization with knowledge of its plans and purposes, each becomes liable for the words and acts of all put forth within the scope of the contemplated line of action. In the present instance, as the above evidence discloses, Boloff must have known the illegal purposes which the Communist party sought to serve. The general character of that party has been given such wide publicity that it is reasonable to assume, in the absence of evidence to the contrary, that any person of mature years and understanding would, after four years of membership in it, glean sufficient information about it to put him upon inquiry as to its illegal activities. (Compare *People v. Flanagan,* 65 Cal. App. 268 (223 P. 1014.)) Besides Boloff, who was born in Russia and remained a citizen thereof, naturally could be expected to possess knowledge of the nature of the Communist party. We, therefore, conclude that the challenged testimony was admissible and summarize our reasons as follows: (1) The evidence shows that the defendant was a member of the Communist party with knowledge of its unlawful plans. The rules relating to conspiracies are therefore applicable to his situation and vicariously charge him with responsibility for Levitt's declaration; (2) The substance of Levitt's remarks had been proved without objection by competent testimony coming from numerous other sources. Even if his statement was inadmissible, the error was nonprejudicial by reason of the rule previously stated.

■ The second and fifth assignments of error, since they are controlled by the same principles of law, can be readily considered together. Each complains because the trial judge excluded items of evidence offered by the defendant without waiting for an objection from the State. In the first of these rulings the court held immaterial, and hence inadmissible, a page of the Oregon Journal, a Portland newspaper, which contained an editorial commenting upon the earnings of the American Telephone & Telegraph Company and its operation in Portland, through a subsidiary without a franchise. In the second ruling, the judge interrupted a lengthy discourse by one of defendant's witnesses after she had completed her answer to a question propounded by defendant's counsel. The argument in support of these claims of error does not urge that admissible testimony was excluded. Contentions of the type now advanced are undeserving of patient treatment. To subscribe to any proposition that the trial judge can not exclude, upon his own initiative, an item of evidence manifestly inadmissible is to reduce the status of one who should be the chief official in the administration of justice to the condition of a mere automaton which moves and speaks only when put into action by others. Thus the judge instead of being a judicial officer would be reduced in rank to that of a mere moderator—presiding and announcing results but unable otherwise to participate. Clearly these assignments of error possess no merit. A number of authorities cited in the footnote at 16 C. J., Criminal Law, p. 885, § 2219, are in harmony with this conclusion. In *Rex v. Powell,* 27 B. C. 252, the Court of Appeals quoted with approval the following language taken from *Rex v. Brooks,* 11 O. L. R. 525: "It was argued that no objection was taken by counsel,

and that is true, but if a mistake is made by counsel that does not relieve the judge in a criminal case from the duty to see that proper evidence only is before the jury.'' It should be unnecessary to buttress this conclusion with other support, but we add that after the court had ruled inadmissible the copy of the newspaper the district attorney tardily presented an appropriate objection in support of the court's ruling, and that the court's action in stopping the witness, who had continued to speak after having answered the question, had been preceded by objections made by the district attorney to like previous conduct upon her part.

■ ■ The third assignment of error contends that the court erred when it refused permission to the defendant to introduce in evidence the aforementioned copy of the Oregon Journal. The offer was made during the cross-examination of W. B. Odale, the witness for the State already described. It is not contended that the editorial could have proved or disproved any item of the indictment, but the defendant argues that he desired to use it ''to test the credibility of respondent's witness.'' His offer of proof accompanying the tender stated that the newspaper ''gets to the question as to whether or not the U. S. is a capitalistic government; (2) that the witness Odale testified on direct examination that he is familiar, to a certain extent, with the teachings of the Communist party * * * and upon cross-examination the defense claims the right to ask the witness Odale whether or not the Communist party teaches the contentions set forth in the editorial.'' The defendant does not argue that the affairs of the telephone company were in any way involved in this case, and, of course, does not contend that Boloff or the Communist party wrote the editorial, endorsed it or accepted it as a text. We know of no authenticity

attached to the editorial which would give it the status of a standard for determining the accuracy of Odale's testimony. A careful comparison of his testimony with the editorial fails to reveal that he testified to any fact or matter mentioned in the editorial. Hence, again, the latter could not have served as a comparison for determining the credibility of Odale. But, apart from all this, the issue for the jury's determination was not the profits of the telephone company and its right to operate in Portland without a franchise, but the problem whether the organization in which the defendant admitted membership employed and taught criminal syndicalism and the propriety of using violence for the purpose of gaining industrial and political ends. The court was guilty of no abuse of the discretion which it possesses in determining the extent of cross-examination when it declined to permit the introduction of the newspaper.

In the fourth and sixth assignments of error the defendant contends that the Circuit Court erred when it overruled his motions for a directed verdict; one of these motions was made at the conclusion of the State's evidence and the other came when both parties rested. We have already set forth a resume of much of the evidence presented by the State. In support of the plea of not guilty, the defendant depended largely upon the testimony of others. These testified, at times somewhat equivocally, that the Communist party does not advocate the use of violence, sabotage, and criminal syndicalism. They also denied that the party advocated the destruction of property, especially property useful as implements of production. They also declared that neither the defendant nor anyone else could bring about a revolution; that would come, they testified, as the result of natural laws already in operation, unless

the capitalistic class obstructed the approaching result. They defined at length what they termed "the materialistic conception of history." The defendant testified that he had joined the Communist party because it constitutes "the working class organization" and because "they try to get better conditions." He denied knowledge of the meaning of criminal syndicalism and disclaimed a belief in the propriety of sabotage. He denied that he had ever committed any act of violence. Otherwise, he made no denial of knowledge that the Communist party teaches and advocates acts of the above character, nor any of the imputations made against that organization by the State's witnesses. Apart from the above, he made no contention that he was unfamiliar with the character of that society.

In support of the motion for a directed verdict, the defendant argues: (1) that the evidence failed to prove that the defendant "is personally guilty of anything"; (2) that the evidence failed to prove that the Communist party taught the doctrine of criminal syndicalism; and (3) that the Criminal Syndicalism Act, if applied to the facts in this case, is violative of the first and fourteenth amendments to our Federal constitution.

Disposing of these contentions, it is our opinion that in order to justify a verdict of guilt it was not necessary that the evidence should show that the defendant was guilty of anything more personal than his mere status of being a member of an organization of the type prohibited by section 14-3,112, Oregon Code 1930. We quote from *State v. Laundy*, 103 Or. 443 (204 P. 958, 206 P. 290), where Mr. Justice HARRIS, after pointing out that the original Criminal Syndicalism Act of this state (1919 Session Laws, p. 25) penalized

only the act of one who shall "become a member of" a society which teaches criminal syndicalism, said: "The Legislative Assembly, which convened next after the assembly that passed chapter 12, Laws of 1919, re-enacted the criminal syndicalism statute and that body of lawmakers was careful to make it unlawful to be a member, for the law now reads: 'who shall be or become a member of, or organize or help to organize * * *' ". And from *Whitney v. California,* 274 U. S. 357, which is a case wherein the Criminal Syndicalism Act of California was applied to one who had become a member of the Communist party, we quote:

"By enacting the provisions of the Syndicalism Act, the State has declared, through its legislative body, that to knowingly be or become a member of or assist in organizing an association to advocate, teach or aid and abet the commission of crimes or unlawful acts of force, violence or terrorism as a means of accomplishing industrial or political changes, involves such danger to the public peace and the security of the State, that these acts should be penalized in the exercise of its police power. * * * The essence of the offense denounced by the Act is the combining with others in an association for the accomplishment of the desired ends through the advocacy and use of criminal and unlawful methods. * * * That such united and joint action involves even greater danger to the public peace and security than the isolated utterances and acts of individuals is clear."

The proof in the case at bar showed that the defendant did something more than merely to join an organization which advocated violence. His membership book shows that he had already joined a revolutionary movement before identifying himself with the Communist party. It also shows that he consistently contributed to the party substantial sums of money; that he attended the meetings of the local unit; and that

he remained in the meeting of August 29, 1930, when the use of violence against the public authorities of Portland was advocated and planned. This portion of the argument in support of a directed verdict is without merit.

■ Our previous review of the evidence clearly shows that the second subdivision of the defendant's argument is based upon a misconception of the facts; the proof with much cogency indicates that the Communist party taught and advocated the use of violence, crime, and sabotage as proper instrumentalities in the winning of industrial and political ends.

■ The third subdivision of the argument (that the act is invalid due to an alleged conflict with the first and fourteenth amendments to the Federal constitution) encounters adjudicated cases of controlling importance. In *State v. Laundy,* supra, this court held that the Criminal Syndicalism Act does not violate the constitutional provisions just mentioned. Our sister state to the north has held to like effect: *State v. Hennessy,* 114 Wash. 351 (195 P. 211). Another recent decision is *State v. Moilen,* 140 Minn. 112 (167 N. W. 345, 1 A. L. R. 331). In *Whitney v. California,* 274 U. S. 357, the identical argument that counsel submits to us was carefully considered and held ineffective, as was also done in *Commonwealth v. Widovich,* 295 Pa. 311 (145 Atl. 295). The defendant rests his argument entirely upon the remarks of Mr. Justice Brandeis in his specially-concurring decision in *Whitney v. California,* supra, wherein he held that the right of free speech and of assembly can be restricted only when the limitation is necessary to protect the State from imminent destruction or from serious injury. He, however, found that the conduct of Miss Whitney and her associates threatened danger to the state in such an imminent and

serious manner that the application of the Act to her case did not violate any safeguards guaranteed to her by the fourteenth amendment. He also pointed out that if the defendant believed that the application of the Act to her conduct violated any provision of the fourteenth amendment, due to the absence of imminent threats of danger to the State, she could have requested special findings from the jury. In *Schenck v. United States,* 249 U. S. 47 (39 S. Ct. 247, 63 L. Ed. 470), the court pointed out:

"The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree."

For a discussion see 76 Penn. Law Rev. 198. The evidence in the present case persuades us that the defendant and his associates in the Communist party were engaged in acts of serious consequence which contemplated the immediate use of violence and crime.

We conclude that the motion for a directed verdict was properly denied.

This leaves for determination only the instructions to the jury. Three of the defendant's requested instructions were rejected; assignments of error are predicated upon these rulings. The defendant also bases a claim of error upon an instruction which the court gave in response to an inquiry by a juror.

■ The first of defendant's proposed instructions states that it would not be a crime under the Criminal Syndicalism Act to "teach, advocate and affirmatively suggest the doctrine of criminal syndicalism, sabotage and the necessity, propriety and expediency of doing acts of physical violence and the commission of crime

and unlawful acts as an end in themselves." The court properly rejected this proposed instruction. The "ends in themselves" must have had some purposes, and if the purposes were political or industrial they would fall within the prohibitions of the act. However, the court's instructions fully, carefully, and in language clearly understandable, expounded the meaning of the act.

The next requested instruction is based upon the court's refusal to instruct as follows:

"The Court instructs the jury that an honest mistake on the part of one who has become a member of an unlawful organization as to its nature and purposes is a defense. Therefore I instruct you that even if you should be convinced beyond a reasonable doubt and to a moral certainty that the defendant is guilty beyond a reasonable doubt and to a moral certainty of all the material allegations in the indictment, you must then inquire as to whether the defendant made an honest mistake as to the nature and purposes of the Communist Party of the U. S. A. when he joined that organization. And if there is a reasonable doubt in your mind, from all the evidence in the case, that the defendant Ben Boloff did not honestly understand the nature and purposes of the organization he joined, a verdict of not guilty must be returned."

It will be observed that the requested instruction predicated the question of guilt and of innocence as of the time "when he joined that organization." As we have previously seen, the act prohibits not only an entry into the membership but also a continuance therein. There was ample evidence to indicate that, after joining, the defendant must have become aware of the purposes of the organization, and as we have seen he did not deny such knowledge after the State had submitted its proof. We, therefore, conclude that the requested instruction was properly refused.

■ The third requested instruction recited:

"The court instructs the jury that it is the theory of the Communist Party of the U. S. A. that change and revolution are inevitable by virtue of the operation of social and economic forces formulated into a theory known as the materialistic conception of history."

Continuing, the requested instruction declared that the Syndicalism Act does not render the teaching of such a theory a crime. It will be observed that the de-. fendant thereby requested the court to adopt his construction of the evidence and pass it on to the jury as one which they must accept. The instruction was properly rejected.

■ The instruction given, to which the defendant excepted, informed the jury that criminal syndicalism as defined by our statute could be committed by teaching revolution and acts of violence against the sovereignty of the Federal government and of the other states, as well as against the government of Oregon. The defendant seems to believe that this instruction was tantamount to saying that a crime committed in any other state could be punished in this state. His construction of the court's language, we believe, is erroneous. The court's interpretation of the statute, as announced in the instruction, declared that an individual who in the state of Oregon advocated the use of violence as a means of effecting political and industrial changes in other states violated our Criminal Syndicalism statute. This interpretation was without error: *The State v. Berquist,* 109 Kan. 368 (199 P. 101).

■■ Defendant's brief closes with a protest—in capital letters—that the penalty imposed was too severe, and pictures him as an ignorant, hard-working sewer digger who had never previously been charged

with a crime. In order to impose justly a penalty which will fit the demands of the situation the trial judge should take into account the nature of the defendant's moral training, his ethical environment, and his knowledge of the established principles of right and wrong. After having endeavored to acquaint ourselves with this defendant's background as it is meagerly revealed by the evidence, and taking account of the fact that much of the aforementioned literature bears the name and address of American publishing houses (in Eastern states) which apparently operate without molestation from the prosecuting officers, and that some of this literature is entered as second-class matter by the post-office officials, it is difficult to understand why this humble offender who obviously occupies an obscure place in life should receive a penalty which is almost the maximum. Benjamin Franklin once declared, "Punishment inflicted beyond the merit of the offense is so much punishment of innocence." Were the scant information which we have concerning the defendant's past sufficient to produce certainty in our minds that the penalty is too severe, we might be justified in giving heed to this final plea, but, under the circumstances, we are compelled to resort to the rule that the nature of the penalty is intrusted, in the first instance, to the discretion of the trial judge, and, finally, to the mercy of the chief executive. It must be borne in mind, however, that the conviction of the defendant has been sustained by reason of proof which showed that the organization of which he was an active member, the Communist party, threatened immediate danger, through violence, to our industrial and governmental status.

It follows from the foregoing that the judgment of the circuit court must be affirmed.

BROWN, CAMPBELL and KELLY, JJ., concur.

BELT, J., Dissenting. In my opinion, it was error to receive in evidence, over the objection of defendant, the testimony of Odale as to the substance of a speech made by Levitt, an alleged member of the Communist party. If there were any evidence that the Communist party had sanctioned or ratified such speech it might be admissible as tending to show what the party advocated, but such is not the state of the record. It may be that Levitt had a misconception of what his party advocated. I find no authority which approves what seems to me such an extreme and dangerous rule as that announced by Mr. Justice ROSSMAN. Neither do I believe that expert testimony is admissible to show what the Communist party teaches and advocates. However, in fairness to the trial court, it may be said that the latter testimony was admitted without objection.

The Criminal Syndicalism Act was enacted during the late World war as a sort of emergency measure. To extend its application to a poor, ignorant sewer digger who entertains erroneous ideas concerning governmental affairs and to imprison him in the penitentiary for a period of ten years is, in my opinion, not in keeping with the proper administration of justice. Throughout the centuries, jails have never been able to kill ideas. It is doubtful if they can do so in this modern and turbulent age.

I dissent.

RAND, J., Dissenting. There was no overt act upon defendant's part proven in this case. I do not believe that the mere fact that defendant was a member of the Communist party is sufficient in itself alone to justify his conviction of the crime with which he was charged.

For that reason and for the reasons stated by Mr. Justice BELT in his dissenting opinion, with which I concur, I am compelled to dissent from the majority opinion in this case.

BEAN, C. J. Having been absent in Umatilla county when the opinion was rendered in the above-entitled case, I concur in the opinion of Mr. Justice BELT, heretofore filed herein.

Petition for rehearing denied January 12, 1932

On Petition for Rehearing

(7 P. (2d) 775)

*Irvin Goodman,* of Portland, for appellant.

*Lotus L. Langley,* District Attorney, and *Benn Conn,* Deputy District Attorney, both of Portland (J. Mason Dillard, of Portland, on the brief), for the State.

*Oscar Hayter,* of Dallas, amicus curiae.

ROSSMAN, J. The petition for a rehearing and the arguments advanced in its support have caused us to consider once more all of the issues presented by this appeal.

At the outset it may be well to take note of the provisions of the Criminal Syndicalism Act (§ 14-3,112, Oregon Code 1930) applicable to the charge made by the indictment. A reference to the acts and conduct which it prohibits will bring to mind more clearly the issues awaiting our attention. It will also

be well to recall that it is the province of the legislature to declare what acts are injurious to the public welfare and to prohibit them by legislative enactment as crimes. When the legislature has spoken, judicial consideration of its enactments is limited to an inquiry whether the constitutional rights of the citizen have been invaded. If they have not, the statute must be sustained and effect must be yielded to it by the courts, even though the latter may seriously disagree with the wisdom of such enactments. A legislative act creates a rule for all; it is not an order or command to some individual; it is permanent, not transient. A law is universal in its application; not a sudden order to and concerning a particular person. The Act under consideration provides:

"Any person * * * who shall be or become a member of, or organize or help to organize, or solicit or accept any person to become a member of, or voluntarily assemble with any society or assemblage of persons which teaches, advocates, or affirmatively suggests the doctrine of criminal syndicalism, sabotage, or the necessity, propriety or expediency of doing any act of physical violence or the commission of any crime or unlawful act as a means of accomplishing or effecting any industrial or political ends, change or revolution or for profit, is guilty of a felony * * *."

Reduced to simple terms, the above law makes it criminal for any one to join or hold a membership in any society which teaches or advocates crime, sabotage or violence as a means of effecting a change or revolution in industry or government.

Defendant's briefs repeatedly mention the Communist Party and Boloff's membership in it; they seem to believe that he was convicted because of his faith in the doctrines of Marx, Engel and Lenine.

That is untrue. His conviction was sustained because he belonged to an organization which advocated violence and crime as approved means of effecting changes in government and industry. The fact that that organization is entitled the Communist Party, that its headquarters are in Russia, and that it is avowedly sympathetic with the workingman are details of no consequence to this court. If the organization of which the defendant is a member had not advocated the use of violence the law would never have taken notice of him or of his society. Had he and his associates proceeded by the means pointed out by the Federal and the Oregon Constitutions they could have undertaken to effect any change in our system of government and of industry which they desired. They could have changed our republic into a purely communistic state with Boloff as its dictator. Only an approving vote by the American people was required, but that approval, evidenced by the necessary number of votes, is the all-important factor in changing our form of government: 6 R. C. L., Constitutional Law, p. 26, § 16. Violence, force or unlawful seizure of the reins of government are not recognized by the constitution and our laws: *The People v. Lloyd,* 304 Ill. 23 (136 N. E. 505). The framers of our constitution made abundant provisions for changes in our form of government by peaceful means. We quote from the words of Mr. Justice Pound in *People v. Gitlow,* 234 N. Y. 132 (136 N. E. 317), wherein he refers to the Communistic program enunciated in the party manifesto as published in the Revolutionary Age (copies of this document were kept in the party office in Portland):

"Such means, even though force and violence are disavowed, are not lawful, for the reason that the form of our government may be lawfully changed only by

the vote of the majority of the people, expressed through the ballot by constitutional methods and that method of change is not the method advocated by the manifesto.''

It is true that our forefathers wrested control from England by force, but at that time the law had provided no means whereby a change in government could be accomplished by ballot. After they had paid with blood and gold a fearful cost for effecting that change in government they wrote into the Constitution which they provided for their posterity a means of effecting future changes without the necessity of paying such a costly price. They provided the ballot. In the recent case of *State v. Diamond*, 27 N. M. 477 (202 P. 988, 20 A. L. R. 1527), a statute, apparently aimed at sedition and insurrection, was held invalid because it failed to distinguish between opposition to government contemplating the use of force and that employing peaceful and legal methods. The court pointed out that the latter means are always available to any one who desires to effect a revolution. (See to like effect *Stromberg v. People of State of California*, 283 U. S. 359 (51 S. Ct. 532, 75 L. Ed. 723, 73 A. L. R. 1484). And in *Fiske v. State of Kansas*, 274 U. S. 380 (47 S. Ct. 655, 71 L. Ed. 1108), the Federal Supreme Court reversed a judgment of conviction, previously sustained by the Supreme Court of Kansas, of a member of the Industrial Workers of the World because the proof failed to show that his organization contemplated the use of violence in its program looking to a change in industry.

But it is suggested that the proof failed to show that Boloff had committed an ''overt act.'' An overt act is nothing more than a step taken by the accused which shows that he has begun to put his designs into execution. The overt act, so-called, must of neces-

sity be some part of the crime, and to ascertain what acts constitute the crime we must look to the statute. Reverting to the Criminal Syndicalism Act, it will be observed that it does not employ the words "overt act" or any of their equivalents. "In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted." (§ 9-214, Oregon Code 1930.) Another section of our laws provides that the rules of the common law which demanded that penal statutes should be strictly construed have no application to our criminal code, but all of its provisions are to be construed according to the fair import of their terms: (§ 14-1043, Oregon Code 1930). It will be observed from the portions of the Act which we have quoted above that the only overt acts which that statute demands as proof of guilt are: (1) organizing a society which teaches or advocates crime, violence, etc.; (2) uniting in membership with a society already in existence; or (3) continuing a membership previously obtained. We are powerless to add additional provisions. In fact, if additional so-called overt acts should be added by the courts the Criminal Syndicalism Acts would be rendered useless. For instance, before their passage our criminal laws already included: (a) laws prohibiting attempts to commit crimes; (b) laws making penally liable those who aided and abetted the commission of crimes; and (c) conspiracy statutes. It must be evident that when the legislature enacted the Criminal Syndicalism Act it intended to prohibit conduct which was not reached by the aforementioned provisions of our criminal code. No decision which has come to our attention—and we have examined many—has demanded more proof than

the defendant's membership in an organization which teaches or advocates violence and crime. For instance, in *State v. Aspelin,* 118 Wash. 331 (203 P. 964), the Washington Supreme Court, in referring to the Criminal Syndicalism Act of that state, said: "In passing this act, the legislature evidently deemed it necessary to put a stop to activities which would naturally result in crimes against persons and property, and made the mere membership in such an organization a crime." From *Berg v. State,* 29 Okl. Cr. 112 (233 P. 497), we quote: " 'Treason' requires more than mere words to constitute the offense. It requires some overt act and proof by two or more witnesses, while the offense here defined is an offense which consists of words only." From *People v. Ruthenberg,* 229 Mich. 315 (201 N. W. 358), we quote: "This statute does not make criminality depend upon the commission of an overt act. It reaches those who advocate or teach the commission of crime as a means to accomplish an end, and those who, by choice, assemble with them. An overt act along the lines of such advocacy or teaching would constitute an entirely different crime punishable now by other laws of the State." In support of its conclusion, the Michigan court quoted from *State v. Laundy,* 103 Or. 443 (204 P. 958, 206 P. 290), wherein this court clearly indicated that membership or the act of joining would suffice. We are satisfied that nothing more is required. Many additional decisions, including the decision of the Federal Supreme Court in *Whitney v. California,* 274 U. S. 357, as suggested in our previous decision, could readily be cited to like effect. Membership alone is sufficient.

It is next argued that our Criminal Syndicalism Act is wartime legislation, and, after having delivered himself of this assertion, the appellant urges that this

court should somehow rid the statute books of this law. Even if the Act was enacted during the war, we fail to understand from what source would come our power to repeal or nullify it. The same body which enacts our laws is also the sole department of government which has the power of repeal, although the power to repeal is not as frequently exercised as the power to enact. Reluctance to legislative repeal oft-times begets administrative nullification and at other times the courts, in order to save themselves the uninviting task of administering a judgment upon the accused which will shock the sense of justice, because the law has outlived its usefulness, resort to the creation of obstructing technicalities and thereby in effect repeal the statute. The latter, however, as they arise to plague the courts in subsequent administration of the criminal laws, have been the source of endless embarrassments. We possess no power of repeal or of nullification and will exercise none. The statute under consideration, when enacted ten years ago, received no dissenting vote. In the interval, five sessions of the legislature have convened and the State has had the services of five different governors, yet this Act has not been repealed, no bill seeking its repeal has been introduced, nor has any one of the five governors in a message to the legislature recommended its repeal. Similar legislation in other states has been frequently applied. We quote from 19 Cal. Law Rev. 64 (the reference is to the California Criminal Syndicalism Act) : "Its enforcement began on May 6, 1919, and by August 15, 1924, 511 persons had been charged on information or indictment with violation of the law. Of these, 504 were arrested and 264 actually tried. One hundred were freed, 31 by acquittal and 69 by disagreement of the jury. One hundred and sixty-

four were convicted, 23 receiving a suspended sentence, and 128 being sentenced to prison for one to fourteen years. Of the 114 who appealed from judgment of conviction 55 won reversals.''

However, the Act was not passed during the war. It was enacted by the 1921 legislative session. The Armistice was signed November 11, 1918, and the treaty of Versailles June 28, 1919. The 1921 Act was preceded by another enacted in 1919 which, however, disappointed those who believed that no man should have a right to hold membership in a society which advocated crime, violence, sabotage or criminal syndicalism as approved means of effecting changes in government or industry because it failed to render unlawful anything but the act of joining. This disappointment was manifested when decisions of our circuit court pointed out that one who continued to retain a membership, procured prior to the enactment of the law, had done nothing in violation of the Act. These decisions created an insistent demand for legislation of a more effective type against such societies and caused the 1921 legislative assembly to repeal the 1919 Act and to enact the 1921 Criminal Syndicalism Act.

We believe it is a matter of common knowledge that the enactment of these statutes was brought about largely by public demand for legislation which would curtail the activities of the society known as the Industrial Workers of the World in the lumbering industry, and by fear of general strikes which at that time were being fomented by that and other organizations. The Seattle and Winnipeg general strikes were then recent occurrences. The lawmakers of this state evidently regarded organizations which preached violence, sabotage and criminal syndicalism as menaces to the law and order of this state.

Bearing in mind that the statute under consideration renders it unlawful for any one to organize or join a society which takes as its objective the preachment and practice of crime, sabotage, criminal syndicalism and armed revolutions as approved means of bringing about industrial and political changes, let us see whether good reason can be found in support of such legislation. The science of medicine today endeavors to prevent disease rather than to step in after the patient has been attacked by illness. Cannot the State, through its legal machinery, endeavor to prevent crime just as it has made progress in the prevention of disease by its health departments? Ordinarily, the criminal law punishes the deed after its commission but, by ignoring definite manifestations of criminal tendencies, fails to prevent its occurrence. Resort to a homely adage will convey the thought we have in mind—we lock the stable door after the horse has been stolen.

The legislature of New York in 1902 gave us an illustration of legislation intended to prevent the commission of crime by intercepting those who plainly manifest a disposition to violate the public peace. In 1900, King Humbert of Italy was assassinated, and in 1901 President McKinley met his death by a similar means. The latter was assassinated at Buffalo by Leon F. Czolgosz, an anarchist, who for several years had been studying the doctrines of anarchy at the circles of anarchistic societies until he had become convinced that all men in high official positions were tyrants and should be removed. It was then seen that the teachings of Emma Goldman, John Most and other anarchists who preached the doctrines of that cult were actually capable of taking effect in the mind of a simple person and of moving him into action. Most, who was

editor of a weekly newspaper called "The Freiheit," had published on the day of President McKinley's assassination, an article entitled "Murder vs. Murder" in which he extolled murder of public officials as a virtue. We quote from his article: "Let murder be our study, murder in every form. In this one word lies more humanity than in all our theories." See *People v. Most* (171 N. Y. 423, 64 N. E. 175, 58 L. R. A. 509), wherein the court, in referring to Most's language, declared:

"No one can foresee the consequences which may result from language such as was used on this occasion. * * * The courts cannot shut their eyes to the fact that there are elements in our population, small in number, but reckless and aggressive, who are ready to act on such advice and to become the assassins of those whom the people have placed in authority."

May 4, 1886, at the Haymarket in Randolph street in Chicago, occurred the Haymarket riot in which seven policemen were killed and sixty more were seriously wounded: 12 American State Trials 1. It was preceded for many weeks by a series of articles in radical newspapers which urged the use of violence against police officers, counselled preparation for revolution and explained the manufacture of powder, dynamite and bombs. The effectiveness of these articles was enhanced by speakers who, in inflammatory words, addressed meetings of discontented workmen, urging revolution: See *Spies v. The People,* 122 Ill. 1 (12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320, and 12 Am. St. Trials 1). After the conviction of Spies, Schwab, Fischer and others of those accused of bringing about the death of the officers, had been sustained (*Spies v. The People,* supra) and the convicted had been executed, Most, on the 12th day of November, 1887, that being the day fol-

lowing the execution, addressed a crowd in New York, exhorting them to avenge the death of those executed in Illinois, and after declaring, "I am an anarchist, and am willing to die for its cause," wound up by declaring, "Arise Anarchy! Long shall it live!" Following Most's speech, he was arrested and charged with a misdemeanor. His subsequent conviction was affirmed in *People v. Most,* 128 N. Y. 108 (27 N. E. 970, 26 Am. St. Rep. 458.) The above two experiences with Most showed to the people of New York that one who used such inflammatory language, well calculated to incite others to action, could not be charged with anything more serious than a misdemeanor. This circumstance and a conviction that the teachings of Emma Goldman had caused the simple-minded Czolgosz to take the life of President McKinley moved the New York legislature, in the year following McKinley's assassination, to enact a law entitled the Criminal Anarchy Statute (for a copy see *People v. Gitlow,* 234 N. Y. 132 (136 N. E. 317)), which, while brief, is not unlike in principle the Oregon Criminal Syndicalism Act. In the same year New Jersey enacted a similar law: Freund, Police Power, section 478. Thus, we have the forerunner of our Criminal Syndicalism Acts. As proof of our assertion that the foregoing were the circumstances that caused the New York legislature to enact its criminal anarchy law, we quote from the language of Mr. Justice Pound in *People v. Gitlow,* supra:

"In 1902 the State of New York adopted the statute under consideration with this definition in mind. The assassination of President McKinley in 1901 had brought forcibly to the attention of the legislature that the publication of articles instigating revolution by the murder of public officials was punishable, if at all, only as a misdemeanor * * *. To nip in the bud the growth of anarchistic theories and to lessen the

possibility of future anarchistic acts or attempts by those whose minds had been excited or poisoned by such publications, the teaching or advocacy of anarchy as then generally understood was made criminal."

However, as was pointed out in *State v. Laundy,* 103 Or. 443 (204 P. 958, 206 P. 290), even the common law regarded as a misdemeanor the act of one who incited another to commit a crime whether the crime was actually committed or not. And the law of conspiracies, to which criminal syndicalism statutes are often likened (*Whitney v. California,* 274 U. S. 357 (47 S. Ct. 641, 71 L. Ed. 1095); *State v. Lowery,* 104 Wash. 520 (177 P. 355)), "go back to the very early pages of the history of the common law": 35 Harvard Law Review 393. As early as 1304, in the reign of Edward I, the statute known as Third Ordinance of Conspirators was enacted in order to amplify the common law. In the 1700s Parliament passed several acts prohibiting workmen from entering into combinations and conspiracies whose purposes were to advance wages, lessen the hours of work, etc. The legislation was intended to restrain those activities of workmen's organizations which would inevitably increase the prices of merchandise: Stephen's History of the Criminal Law, p. 206. The foregoing, we believe, indicates that the principle upon which Criminal Syndicalism laws are based is very old.

In 1916 the Commonwealth of Australia enacted a Criminal Syndicalism law. By 1922, 19 American states, as well as Hawaii and Alaska, had passed similar statutes. See 19 California Law Review, p. 64. Since that time many other states have enacted similar laws.

Bringing the above instances concerning the assassination of President McKinley and the Haymarket

riot down to present times, it may be observed that had Princip, Chabrinovitch and their fellow conspirators been intercepted before they carried into execution their murderous designs upon Franz Ferdinand, Archduke of Austria, by shooting him to his death June 28, 1914, the World war possibly would never have been declared.

It is, of course, evident from the above that legislation of the type before us was enacted not for the purpose of denying to any one the right of teaching socialism, communism, or any other form of social, economic compact, but for the exclusive purpose of preventing the use of violence by forbidding membership in societies which teach it. Laws of this type are founded upon the principle that the moron, especially those who are class-conscious, and who believe that men in high places got there through imposition upon the toilers, are likely to translate into action the words of their voluble leaders. Czolgosz is described as a "simple, uneducated, foreign youth, an ordinary, industrious workman, without bad habits and honest in his relation with his fellowmen, but unhappily listening to the advocates of anarchy": 14 American State Trials, V. Laws of this kind also accept as granted the proposition that no one, whether intelligent or otherwise, has a right to advocate the commission of crime, the use of violence and the employment of sabotage. These laws go beyond that and insist that when men band themselves together into a compact organization their effectiveness for evil doing is increased. The will of the schemer is often carried out by the acts of the unthinking. We quote from one who made a study of the Czolgosz atrocity: "Why the notorious Emma Goldman, whose teachings inspired his crime,

was not put in the dock with him is hard to explain, unless it was that the laws of New York were defective in this respect"; 14 American State Trials, p. 6.

██ The problem now arises whether legislation of this kind based upon the above principles is violative of the sections of the Federal and Oregon Constitutions which grant the right of freedom of speech and of peaceable assembly. The clear reasoning and ample citation of authority in Mr. Justice HARRIS' decision in *State v. Laundy,* supra, ought to convince any inquiring mind that no conflict exists between this act and those constitutional provisions. The decision just mentioned states: "The Syndicalism Act does not violate the constitutional right to speak freely nor the constitutional right to assembly peaceably." In addition to the numerous authorities cited by Mr. Justice HARRIS supporting the validity of such statutes will be found collected in the following compendiums many additional decisions to like effect: 20 A. L. R. 1535, 1 A. L. R. 336, 19 Cal. Law Rev. 64, and 76 Penn. Law Rev. 198. And see also the cases cited in *Berg v. State,* 29 Okl. Cr. 112 (233 P. 497). Due to appellant's insistence, we have once more carefully considered the contention that a conflict exists.

██ It is clear that freedom of speech is not an absolute right without limitation. It is not the equivalent of "unbridled license" as was pointed out in *State v. Laundy,* supra. It has its limitations. They are hard to define but exist nevertheless. We quote from *State v. Boyd,* 86 N. J. Law 75 (91 Atl. 586):

"The fundamental answer to the point raised is that free speech does not mean unbridled license of speech, and that language tending to the violation of the rights of personal security and private property, and toward

breaches of the public peace is an abuse of the right of free speech for which, by the very constitutional language invoked, the utterer is responsible.''

Mr. Justice Holmes in his dissenting opinion in *Abrams v. United States*, 250 U. S. 616 (40 S. Ct. 17, 63 L. Ed. 1173), defined freedom of speech as ''free trade in ideas'' and added ''the best test of truth is the power of thought to get itself accepted in the competition of the market.'' Milton wrote thus of the capacity of truth to gain dominance over the false (2 Milton's Prose Works (1871 Ed.), p. 96): ''And though all the winds of doctrine were let loose to play upon the earth, so Truth be in the field, we do injuriously by licensing and prohibiting to misdoubt her strength. Let her and falsehood grapple. Whoever knew Truth put to the worse in a free and open encounter?'' The ideal of free speech as defined by Judge Holmes, and as is illustrated by the quoted words of Milton, is an objective well worthy of national aspiration. When all within the nation have become Americanized and when all of our people have received schooling, not only in matters of common learning but also in the fundamentals of government as employed in a republic, these ideals will become realities. But, in the meantime, we have a practical problem. We are dealing with mankind as we know it. The entire history of our country readily demonstrates that the free exchange of ideas through the avenue of free speech can be confidently relied upon to reveal the truth, enthrone law and order, and show the wiser course of action for the nation to pursue; yet instances like that of Czolgosz, the Haymarket riot, and many others which come readily to mind indicate quite clearly that when truth finds itself in a race with that which is false, especially when the latter is championed in

the secret meeting places of class-conscious, disgruntled fragments of a society by professional agitators, truth is often tardy in overtaking the vicious. In the delay which ensues before it has asserted itself the poisonous propaganda of the apostles of the false takes effect in creating turbulence and disorder. And as we have seen above, in one instance at least, it caused the assassination of a dearly beloved president.

The provisions of our constitutions which guarantee freedom of speech and due process of law are not the only undertakings of constitutional government. The Federal Constitution in its preamble states that the purpose of the Union is to ''establish justice, insure domestic tranquillity, provide for the common defense, promote the general welfare, and * * *.'' The preamble of the Oregon Constitution is: ''We, the people of the State of Oregon, to the end that justice be established, order maintained, and liberty perpetuated, do ordain this Constitution.'' Now, would it not startle the people of Oregon if this court should hold that the selfsame constitutions which announced purposes of establishing justice, insuring domestic tranquillity, and maintaining order renders it impossible to curb a society which teaches crime, urges the employment of violence, defends sabotage, and actually proposes to inaugurate at the first opportune moment a revolution by warfare? In fact, would it not be a surprise to the people of our state to be told that a document which announces the above purposes contains also a provision guaranteeing to those who teach crime, revolution, criminal syndicalism and sabotage, permission to go on unmolested by the law? And does it not seem anomalous that one who is so intolerant of the views of others, and too impatient to be willing to employ free speech to gain the votes needed to put

into effect the changes in government which he champions, and who, therefore, proposes to achieve his ends by using violence, should believe that the defense of freedom of speech is available to him? Let us recall that the Communist Party adopted as its shibboleth: "Bullets, not ballots."

But, regardless of whether we might believe that freedom of speech should be expanded or narrowly confined, we are bound by the law as it exists. And it is too well settled to need the citation of authority that "freedom of speech" as expressed in the Constitution means freedom of speech as it was understood by the common law at the time when the Constitution was adopted.

The Pennsylvania court in *Commonwealth v. Widovich*, 295 Pa. 311 (145 Atl. 295), in referring to the Sedition Act of that state, said:

"The act does not emasculate political discussions. Government officers, the conduct of public officials and the laws themselves, may be criticized without fear of punishment, unless the statements should be maliciously false, and then punishment is meted out in the terms of injury to an individual. Remedies for the relief of supposed wrongs or the redress of grievances may be suggested and urged without fear of punishment, as provided by article I, section 20 of our Constitution. Books treating historically of past revolutions, of the doctrines of the various forms of governments, books and essays on sociology and economics, which treat on the various influences in government and their possible elimination, or their supposed peril, the writings of reformers,—all these may be safely offered for sale or taught as they are now in our educational institutions. Freedom of thought, speech and the press is as extensive since the passage of the act as it was before. The Sedition Act does not attempt to interfere with these rights; it contemplates a higher

and broader ground. The danger line in utterances is reached when one strikes at the very foundation of organized society by inciting rebellion in an attempt to destroy it.''

In *Frohwerk v. United States,* 249 U. S. 204 (39 S. Ct. 249, 63 L. Ed. 561), Mr. Justice Holmes said:

''We venture to believe that neither Hamilton nor Madison, nor any other competent person then or later ever supposed that to make criminal the counselling of a murder within the jurisdiction of Congress would be an unconstitutional interference with free speech.''

The New York court in *People v. Gitlow,* 234 N. Y. 132 (136 N. E. 317), said:

''The first amendment to the United States Constitution and section 8 of article I of the New York State Constitution, which secure the freedom and liberty of speech and of the press, do not protect the violation of this liberty or permit attempts to destroy that freedom which the constitutions have established.''

The same decision quotes from *People v. Most,* 171 N. Y. 423 (64 N. E. 175, 58 L. R. A. 509), thus:

''It places no restrain upon the power of the legislature to punish the publication of matter which is injurious to society according to the standard of the common law. It does not deprive the state of the primary right of self-preservation. It does not sanction unbridled license, nor authorize the publication of articles prompting the commission of murder or the overthrow of government by force.''

From *People v. Cox,* 66 Cal. App. 287 (226 P. 14), we quote:

''A constitutional government contains within itself the method, the manner, and the power of constitutional change, and that change is always subject to the will, wish and prerogative of the majority of the people exercising the right of suffrage in a legal and constitutional manner. So long as these methods

of procedure are open and may be advocated by anyone, it cannot with consistency be urged that the right of the press or of free speech is either curtailed or abridged by an act which limits the exercise of the effort to make such changes as may be desired by peaceable means. * * * One may freely state his reasons why a change in government is desirable, but he has no license by reason thereof to advocate the destruction of or take steps to incite others to destroy the property or imperil the lives of those who do not agree to such changes. One method is lawful, the other is not, because it strikes at the basis of all government, and denies the right of self-preservation. This does not presuppose the continuance of the existing order, but it does presuppose that the existing order, condition and structure of society shall be changed only by peaceable means, and that violence and destruction have no place in human government. We find nothing in the constitution of this state nor in the constitution of the United States which denies the right of the state to protect itself from violent assaults whether directed from within or from without.''

From the recent decision of the Federal Supreme Court in *Stromberg v. People of State of California*, 283 U. S. 359 (51 S. Ct. 532, 75 L. Ed. 1117, 73 A. L. R. 1484), wherein that court is referring to the constitutional provisions concerning freedom of speech, we quote:

''The right is not an absolute one, and the state in the exercise of its police power may punish the abuse of this freedom. There is no question but that the state may thus provide for the punishment of those who indulge in utterances which incite to violence and crime and threaten the overthrow of organized government by unlawful means. There is no constitutional immunity for such conduct abhorrent to our institutions.''

From *People v. Lloyd*, 304 Ill. 23 (136 N. E. 505), being a case wherein the Illinois Criminal Syndicalism

Act was applied to a member of the Communist Party who claimed that the law improperly restricted freedom of speech, the court said:

"It would be a strange constitution, indeed, that would guarantee to any man the right to advocate the destruction by force of that which that constitution guarantees to the people living under its protection."

From *Whitney v. California,* 274 U. S. 357 (47 S. Ct. 641, 71 L. Ed. 1095), wherein the Federal Supreme Court sustained the conviction of Miss Whitney for a violation of the California Criminal Syndicalism Act, committed in the same manner charged against Boloff, the court said:

"That the freedom of speech which is secured by the Constitution does not confer an absolute right to speak, without responsibility, whatever one may choose, or an unrestricted and unbridled license giving immunity for every possible use of language and preventing the punishment of those who abuse this freedom; and that a state in the exercise of its police power may punish those who abuse this freedom by utterances inimical to the public welfare, tending to incite to crime, disturb the public peace, or endanger the foundations of organized government and threaten its overthrow by unlawful means is not open to question."

We quote again from the Federal Supreme Court, this time from its decision in *Ex parte Yarbrough,* 110 U. S. 651 (4 S. Ct. 152, 28 L. Ed. 274):

"That a government whose essential character is republican, whose executive head and legislative body are both elective, whose most numerous and powerful branch of the legislature is elected by the people directly, has no power by appropriate laws to secure this election from the influence of violence, of corruption and of fraud, is a proposition so startling as to arrest attention and demand the gravest consideration.

\* \* \* If it has not this power it is left helpless before the two great natural and historical enemies of all republics, open violence and insidious corruption.''

The argument that criminal syndicalism acts improperly impair the constitutional right of freedom of speech as enunciated in the specific portion of our constitutions which names the right, and also as embraced within the Fourteenth Amendment, have been so many times rejected that we shall refer no further to the decisions, but shall state their effect by employing the language of the Michigan Supreme Court (*People v. Ruthenberg*, 229 Mich. 315 (201 N. W. 358)):

''The reasons advanced here against the constitutionality of the act have been urged against similar acts in other jurisdictions and found to have no merit.''

We shall bring to a close our consideration of the contention that the Criminal Syndicalism Act violates the constitutional provisions of free speech and peaceable assembly by employing the language of Mr. E. F. Albertsworth in 22 Illinois Law Review, 541, wherein the writer is reviewing the Federal Supreme Court's decision of *Whitney v. California*:

''On the other hand, growing out of some troublous experiences over a period of time, some states have ascertained that in abstracto this type of reasoning is fallacious; that, on the contrary, actually some groups or societies—particularly radical workingmen—are not so persuasive to the voice of reason as some believe, but that actual experience has demonstrated that where such individuals, with strong opinions on real or imaginary grievances, congregate under leaders who themselves are not of a 'reasonable' disposition, a hot-bed or breeding-ground of direct action is present which has often led to serious acts of violence and terrorism. Hence, it is believed by this group of publicists that

it is not unreasonable to prevent the formation, under criminal penalties, of such societies themselves, as well as membership in them; but leaving to those thus disposed to advocate violence, the complete right, in common with all other persons, of securing their objectives through appeal to reason and argument, the use of the ballot, and peaceable methods in general. Therefore, it would seem entirely reasonable for a state legislature, after investigation based upon evidence, to declare that in its opinion repression was both desirable and necessary of groups of all kinds—whether workingmen or non-workingmen—which advocate force for the accomplishment of their objects; and whatever arguments of undesirability or unsoundness are raised by doubting Thomases must be addressed to their constituents and not to the courts.

"Such is the viewpoint of the majority opinion in the instant case, which it has consistently maintained in analogous cases which have come before it in the past. From a constitutional standpoint, the conclusions reached seem impregnable; with reference to the desirability of such legislation, opinions will differ."

It must be evident from the foregoing—and we could readily multiply our citations—that the provisions of constitutional law which guarantee freedom of speech were never intended to justify the words of one who maliciously cried "Fire!" in a crowded auditorium, or of another who counselled crime, or of a revolutionist who sought to overthrow our government by force. By so holding, we deny to no one a privilege which he should cherish. To all is left untouched the right to appeal to reason. All may labor for revisions in our laws, and our constitution. No one is denied the right to seek any change in our form of government or of industry which he may desire. The law under consideration does not molest the advocacy, by peaceful means, of the program sponsored by the Communist

Party. The ballot box is rendered even more safe when force and appeals to force are forbidden. The only thing denied is violence and appeals which incite direct action and exhort the commission of crime.

We come now to the contention that when the Criminal Syndicalism Act is actually put into application upon this defendant, under the circumstances revealed by the evidence, he is denied the benefit of the aforementioned constitutional guarantee. Although the evidence as reviewed in our previous decision clearly indicates that the Communist Party, through its literature and authorized speakers, advocated immediate, direct action upon its program of violence, still the defendant argues that the time had not yet come when this language must cease. The defendant's brief nowhere contends that the numerous publications distributed by his organization and the speeches made in its behalf were only jests, academic discussions, or "words, words, nothing but words." Some of the literature, as for instance, copies of the Communist Manifesto, which was introduced in evidence in this case, was denounced in the decisions of other courts cited in this opinion and actually brought about the conviction of the accused. It must be observed that in the consideration of this feature of the case the party program, more than the defendant, is on trial. The question for solution is: How long must the state wait before taking action when it is confronted with an organization which urges a revolution, insists that the workers arm themselves, which clamors for action, and whose local unit prepares itself for demonstrations and clashes with the police? We quote from *The People v. Lloyd,* supra, being an appeal by the defendant from a conviction which charged him with viola-

tion of the Criminal Syndicalism Act of Illinois, committed through his membership in the Communist Party:

"Plaintiffs in error seem to argue that the language of the Act must be such that the term 'violence and other unlawful means' is limited to such unlawful acts as create a clear, real and imminent danger to the form of government now secured to this state, but this is not the true law. Of course, if the acts are too trivial for the law's notice and create no apparent danger and no perturbation in the peaceful order of things, then no crime is committed; but if the means advocated are apparently adapted to the end then the public peace, so far as advocacy is concerned, is as much disturbed as if they should be so actually. (1 Wharton on Crim. Law, 11th Ed., secs. 221-225; 1 Bishop's New Crim. Law, secs. 737-740). Manifestly, the legislature has authority to forbid the advocacy of a doctrine designed and intended to overthrow the government without waiting until there is a present and imminent danger of the success of the plan advocated. If the state were compelled to wait until the apprehended danger became certain, then its right to protect itself would come into being simultaneously with the overthrow of the government, when there would be neither prosecuting officers nor courts for the enforcement of the law."

From *Gitlow v. People of the State of New York,* 268 U. S. 652 (45 S. Ct. 625, 69 L. Ed. 1138), we quote:

"That utterances inciting to the overthrow of organized government by unlawful means, present a sufficient danger of substantive evil to bring their punishment within the range of legislative discretion, is clear. Such utterances, by their very nature, involve danger to the public peace and to the security of the state. They threaten breaches of the peace and ultimate revolution. And the immediate danger is none the less real and substantial, because the effect of a given utterance cannot be accurately foreseen. The state cannot reasonably be required to measure the

danger from every such utterance in the nice balance of a jeweler's scale. A single revolutionary spark may kindle a fire that, smouldering for a time, may burst into a sweeping and destructive conflagration. It cannot be said that the state is acting arbitrarily or unreasonably when in the exercise of its judgment as to the measures necessary to protect the public peace and safety, it seeks to extinguish the spark without waiting until it has enkindled the flame or blazed into the conflagration. It cannot reasonably be required to defer the adoption of measures for its own peace and safety until the revolutionary utterances lead to actual disburbances of the public peace or imminent and immediate danger of its own destruction; but it may in the exercise of its judgment suppress the threatened danger in its incipiency. * * * In other words, when the legislative body has determined generally, in the constitutional exercise of its discretion, that utterances of a certain kind involve such danger of substantive evil that they may be punished, the question whether any specific utterance coming within the prohibited class is likely, in and of itself, to bring about the substantive evil, is not open to consideration. It is sufficient that the statute itself be constitutional and that the use of the language comes within its prohibition."

■■ The literature distributed from the local headquarters of the Communist Party and the speeches made by its authorized representatives in addressing crowds in Portland demanded direct action. Certainly a jury would have done no violence to the evidence had it made a special finding to that effect. The defendant asked for none. The nature of the literature and the diatribes of the speakers were not abstract discussions of warfare, of history, and of the destructive power of violence, but were forceful appeals to action. Repeatedly, the literature and the speakers denounced the ballot as meaningless to a Communist, and commended

bullets as the proper course. In *People v. Ruthenberg,* supra, where similar evidence was under review, the court said: "They spurn the ballot and appeal to direct force." Direct action was demanded and it, in fact, constitutes the implement upon which the party relies to substitute a dictatorship of the proletariat for our present government. The State had the right to assume that the Communist Party meant what it said when it used the foregoing language. When one in strong words threatens the life of the individual beside him, the latter need not wait to see whether the murderous words will be carried into execution before he seeks the protection of a peace officer, but is justified in believing that such language will culminate in the threatened deed; and likewise the State was warranted in believing that the inflammatory literature and calls to action which poured forth from the local headquarters of the Communist Party were not mere vituperation nor the empty words of harmless, irrational men. Had the defendant believed that this issue could have been resolved in his favor he could have sought a special finding upon it, as suggested in *Whitney v. California,* supra. The same decision is also authority for the statement that the evidence was reasonably capable of supporting a finding in favor of the State. *People v. Lloyd,* supra, *People v. Ruthenberg,* supra, and *People v. Gitlow,* 234 N. Y. 132 (136 N. E. 317), and *Gitlow v. People of New York,* supra, may all be cited to like effect. We have mentioned the fact that a part of the proof placed before the jury was a copy of the Communist Manifesto. The latter document is thus described by Chief Justice Hiscock in *People v. Gitlow,* supra:

"As we read this manifesto, interspersed with sentiments and statements such as we have quoted,

we feel entirely clear that the jury were justified in rejecting the view that it was a mere academic and harmless discussion of the advantages of communism and advanced socialism and a mere Utopian portrayal of the blessings which would flow from the establishment of those conditions. We think, on the other hand, that the jury were entirely justified in regarding it as a justification and advocacy of action by one class which would destroy the rights of all other classes and overthrow the State itself by use of revolutionary mass strikes. It is true that there is no advocacy in specific terms of the use of assassination or force or violence. There was no need to be. Some things are so commonly incident to others that they do not need to be mentioned when the underlying purpose is described.''

The commonly accepted test for determining whether the accused's conduct constitutes such a threat of danger against the State that to apprehend him will not violate his right of freedom of speech is given in *Schenck v. United States*, 249 U. S. 47 (39 S. Ct. 247, 63 L. Ed. 470). The much-quoted language will be found in our previous decision. It is always a question of proximity and degree. When the threatening language has progressed to the point that it is creating a clear and present danger of action the State need not wait until the blow is struck, but may proceed to protect the public peace. It is our belief that this contention of the defendant lacks merit.

■ It is again argued that the circuit court erred when it permitted the witness Odale to repeat the portion of Leavitt's address mentioned in our previous decision. On behalf of the defendant it is argued: ''It is probably true that the literature of the Communist Party was admissible in the Boloff case, but we believe that all testimony regarding either speeches or individual statements made by alleged members of the

Party was hearsay and inadmissible." No individual statements were received over objection. The brief of *amicus curiae* concedes that the disposition of this assignment of error in our previous decision "is well fortified." It will be recalled that Odale's testimony was preceded by uncontradicted testimony which showed that the local unit of the Communist Party had designated Levitt as an authorized speaker. In other words, he was an agent of the society acting within the scope of his authority when he spoke. This circumstance clearly distinguishes this challenged testimony from the mass of inadmissible hearsay—213 pages—commented upon in *State v. Dingman*, 37 Idaho, 253 (219 P. 760), being the authority upon which defendant relies. There can be no distinction—affecting admissibility—between a written declaration and a spoken one. Moreover, it will be recalled that the Criminal Syndicalism Act renders unlawful membership in societies of only a certain kind; that is, societies which teach, advocate and affirmatively suggest crime, violence, sabotage, etc. Hence, it was incumbent upon the State to prove that the Communist Party "advocated" the use of violence. The court's order which permitted the State to offer in evidence this item of proof was nothing more than yielding to the State its right to prove the above element of the crime by the declarations of an authorized speaker. Citations in addition to those set out in our original decision could readily be added which hold that Odale's testimony was admissible for the purpose of proving the character of the society, but we believe that conclusion needs no further buttressing by the citation of authority. We add, however, to our previous citations, *Burns v. United States*, 274 U. S. 328 (47 S. Ct. 650, 71 L. Ed. 1077). In that case the Federal Supreme Court, in sustaining

the conviction of a member of the Industrial Workers of the World for the crime of criminal syndicalism, explained in part the reasons for its conclusion that that organization advocated sabotage, thus:

"One of the witnesses testified: 'I heard * * * a member of the I. W. W. say in a speech on May 10, 1923: 'When you go back to work, if we do have to go to work, we will put on the wooden shoe.' Then he said: 'In case you are loading telephone poles on a ship down there, sometime the boss is not looking you can slip a couple of poles crossways and then cover up, and then when that ship goes to sea naturally she will start rolling and the cargo will shift, and then she will come in listed like the one you see out in the harbor, then she has got to tie up to the dock, and she will have to unload the telephone poles and put them in again and put them straight, and then we will get paid for the loading originally, and get paid for unloading it and get pay for loading it again, and that will hit the bosses hard in the pocketbook.' The foregoing sufficiently shows the foundation of fact for the portion of the charge complained of."

 The briefs argue that the enforcement of laws of this character do the State more harm than good, that the trial of the case inevitably gives publicity to the cause espoused by the accused, and tends to make him a martyr in the event of his conviction. This may be true. The trials of the early Christians instead of suppressing their teachings strengthened the voice of the disciples. It may also be true that prosecution drives the adherents of the faith from the open into secret, remote meeting places. But the problems arising from these circumstances are not for our solution. The argument should be addressed to other departments of the State government.

 It is again urged that the circuit court erred when it declined to subscribe to an instruction re-

quested by the defendant which contained the following language: "Therefore, I instruct you that even if you should be convinced beyond a reasonable doubt and to a moral certainty that the defendant is guilty beyond a reasonable doubt and to a moral certainty of all the material allegations in the indictment, you must then inquire as to whether the defendant made an honest mistake as to the nature and purposes of the Communist Party of the U. S. A. when he joined that organization." The instruction continued that if the jury doubted reasonably whether the defendant understood the nature of the organization "he joined" it should resolve the doubt in favor of the defendant. The court declined to give the requested instruction but told the jury: "You are further instructed that guilty knowledge of the defendant that the Communist Party of the U. S. A. did teach, advocate or affirmatively suggest any or all of said acts or doctrines named in the indictment is not an element of the offense." The defendant saved no exception to the portion of the charge just mentioned, but preserved an exception to the court's refusal to subscribe to the requested instruction. As pointed out in our previous decision, the requested instruction made guilt dependent upon whether the defendant was aware of the character of the Communist Party at the time "when he joined that organization." According to the evidence, Boloff joined in January, 1924, and, since the court instructed the jury that the statute of limitations rendered it impossible to bring in a verdict of guilt unless the alleged unlawful act was committed "on some date within three years prior to the date of the indictment," the requested instruction, had it been given, would have been tantamount to a directed verdict in favor of the defendant. The indictment alleged that Boloff com-

mitted the unlawful act, not by joining the Party in 1924, but by being a member on August 29, 1930. Hence, the exception which the defendant saved to the court's refusal to grant the requested instruction discloses no error. The defendant saved no exception to the instruction which the court gave. In *State v. Laundy,* 103 Or. 443 (204 P. 958, 206 P. 290), Mr. Justice HARRIS pointed out very clearly that the only error reviewable by this court, except in rare instances, is error to which an exception has been saved. Occurrences which take place in the trial court, and to which the defendant voices no exception, may properly be deemed by both the court and opposing counsel as meeting with the defendant's approval. It is true that a rule of this court reserves to it "the right in furtherance of justice to notice upon its own initiative a plain error of law" but we do not believe that the facts warrant the application of that rule to the contention now before us. Can we assume that this defendant was unfamiliar with the nature and character of the Communist Party at the time of his arrest? Mr. Justice RAND recently declared: "Members of a corporation are, as a general rule, chargeable with knowledge of its by-laws and cannot plead ignorance of them to avoid their operation: 14 C. J., p. 347." (*Doehler v. Lansdon,* 135 Or. 687 (291 P. 392, 298 P. 200)). How then can this defendant, a member of the Communist Party, which is a non-stock corporation, be permitted to negative knowledge of its program which is not only set forth in vast masses of literature, but which has also been proclaimed and discussed everywhere? But if an issue exists let us once more revert to the facts. The defendant's brief admits that he joined the organization in January, 1924. He was not arrested until November 1, 1930. He was born in Russia and was still a citizen

of that country at the time of his arrest. He described himself as being 37 years of age and stated that he had lived in Portland for 19 years. He added that he had found employment principally in construction work but had also worked in mines and in factories. At one time he had been employed in Alaska and at another time followed highway work in the state of Washington. The sewer work which he says he performed consisted of connecting the drain pipes of new dwelling houses with the main pipe in the street. Although he testified that he understood that the organization of which he was a member was a workingmen's society which was endeavoring to better conditions for the working man, he nowheres claimed ignorance of its program of violence and of revolution by force. The minority decision quotes a portion of Boloff's testimony but the omitted parts are more significant. Boloff attended meetings in the local hall where the red flag of revolution was constantly on display and where quantities of literature profusely illustrated with pictures of men bearing arms and engaged in violence were kept for distribution. According to the record, he attended at least one meeting where the use of violence was advocated by the speakers. According to his own testimony he was a frequenter of the Plaza Blocks in Portland where the Communist Party speakers held forth. There he became well acquainted with at least one of the officers of the society. His claim of ignorance was thus avowed by him: "I can't read, I can't write, and I can't speak English." We believe the conclusion is justified that no citizen of Russia, in the prime of life and possessed of enough intelligence to perform the various kinds of work in which Boloff has engaged, could remain a member of the Communist Party for six years and attend its meet-

ings occasionally without becoming aware of the fact that that organization taught and advocated violence as a means of effecting changes in government and industry. For these reasons, we decline to apply the above mentioned rule of court. Had Boloff intended to present an issue upon the questions whether he was ignorant of the Communist Party's teachings upon violence after the State had produced the vast quantity of evidence as to the Party's program, and his familiarity therewith, he should have testified directly upon those points.

So far, we have expressed no opinion upon the question whether the instruction actually given correctly stated the law because the exceptions saved do not present that issue. But in *State v. Laundy,* supra, where the question was properly before the court and where Mr. Justice HARRIS considered the issue at length, this court said: "The statute neither expressly nor impliedly makes guilty knowledge or criminal intent essential elements of the crime."

We shall take occasion to express our opinion upon only one other matter argued in the briefs. Upon all other contentions our opinions are sufficiently expressed in our previous decision. We add, however, that it is altogether possible that the record of the trial court is not entirely free from error. It would be remarkable if a trial, lasting for three or four days, was conducted in such perfect adherence to the letter of the law that no one bent upon faultfinding could point to even a minor transgression of the rules of evidence or to a failure of the instructions faithfully to recite every detail of the substantive law applicable to the charge contained in the indictment. However, the purpose for which appellate courts were created

was not that they should serve as a dragnet through the cumbersome records of trials in the hope of finding some technical deviation from the letter of the law. To the contrary, the purpose of a court of this kind is to ascertain whether the defendant had a fair trial under the law and whether his conviction is based upon substantial evidence. The brief of *amicus curiae,* which we have read with interest, urges us to regard as error evidence which was received with the express approval of the defendant's attorney, and regard as erroneous instructions to which no exceptions were saved. The attorney who represented the defendant during the course of the trial has had several years of active practice and is capable of conducting a defense of this kind. During the course of the trial he was alert to protect the interests of his client. After having reviewed the entire record, we believe that it is free from error of the kind above described, and that the defendant's conviction is supported by substantial evidence.

We are again met with the argument that the penalty imposed upon the defendant by the trial judge was too severe. The brief of *amicus curiae* declares that the penalty violates Article 1, section 16, Oregon Constitution, which provides: "Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense." Similar contentions have been urged in other cases. For instance, Gitlow, who was the defendant in *People v. Gitlow,* supra, was sentenced to hard labor for a term of five to ten years (The Inquiring Mind, Chafee, p. 102) upon a charge that he had violated the New York Criminal Anarchy Act by publishing in The Revolutionary Age the Communist Manifesto. His contention that the penalty was too severe was disposed of by the Court of Appeals

(234 N. Y. 132, 142) as follows: "Although I recognize that the sentence may have been heavy for the offense, yet I cannot see wherein any error has been committed." Miss Whitney, who was the defendant in *Whitney v. California,* supra, was sentenced to San Quentin prison for a term of one to fourteen years. (The Inquiring Mind, Chafee, p. 120.) Miss Whitney's offense was no greater than Boloff's. It arose out of her membership in the Communist Party and the fact that the proof showed that that organization proposed to employ violence. A reading of the Federal Supreme Court decision indicates that Miss Whitney was opposed to a program of violence and had urged the organization to employ political methods; that is, an appeal to the ballot box. The instrument of pardon for Miss Whitney by the governor of California described her as a woman who had performed much public service. The appellate courts did not discuss her penalty. Lloyd, who was the defendant in *People v. Lloyd,* supra, was sentenced to imprisonment in the penitentiary and to pay a fine of $2,000. He also argued that the penalty was too severe. In rejecting this contention, the Illinois court said: "When one considers the blessings of the form of government now secured to this state and nation, it is difficult to think of a punishment disproportionate to the offense of advocating the overthrow of our government by force and violence. * * * The courts have jurisdiction to interfere with legislation upon this subject only where there has been a great departure from the fundamental law and the spirit and purpose thereof, and a penalty imposed which is manifestly in excess of the constitutional limitations." In *State v. Moilen,* 140 Minn. 112 (167 N. W. 345, 1 A. L. R. 331), the defendant had been convicted of a violation of the Criminal Syndicalism Act of

Minnesota by advocating, through his membership in the Industrial Workers of the World, the use of sabotage. His contention that the penalty prescribed in the statute constituted "cruel and unusual punishments" within the contemplation of the Minnesota constitution was thus answered by the court:

"The term 'cruel and unusual punishments,' as used in the constitution, has no special reference to the duration of the term of imprisonment for a particular crime, though it would operate to nullify the imposition, by legislation, of a term flagrantly in excess of what justice and common humanity would approve. The purpose of incorporating that particular provision in the constitution was to prevent those punishments, which, in former times, were deemed appropriate without regard to the character or circumstances of the crime, but which later standards in such matters condemned as unjust and inhuman; such punishments as burning at the stake, the pillory, stocks, dismemberment, and other extremely harsh and merciless methods of compelling the victim to atone for and expiate his crime. The intention was to guard against a return to such inhuman methods."

We add, however, that after the conviction of Miss Whitney and of Lloyd had been sustained, the governors of their respective states granted them pardons (The Inquiring Mind, Chafee, p. 133). Likewise, after Gitlow's conviction had been sustained by the Federal Supreme Court, he was pardoned (The Inquiring Mind, Chafee, p. 106). The record contains only the meager description of the defendant given by himself when he became a witness in his own behalf. We all know that before a sentence is imposed a careful judge apprises himself concerning the defendant's past life, his capacity to comply with the adopted standards and his former attitude towards law and order. We assume that such inquiries were made in the present instance before

sentence was imposed and convinced the trial judge that the penalty was appropriate. However, this information concerning the defendant is no part of the present record and generally is omitted. Since we have none of this information, and since the circuit court's exercise of discretion in imposing the penalty has not been made the subject matter of an assignment of error, we are compelled to assume that the penalty is just.

In our previous decision, however, we expressed ourselves concerning the penalty thus:

"It is difficult to understand why this humble offender who obviously occupies an obscure place in life should receive a penalty which is almost the maximum. Benjamin Franklin once declared, 'Punishment inflicted beyond the merit of the offense is so much punishment of innocence.' Were the scant information which we have concerning the defendant's past sufficient to produce certainty in our minds that the penalty is too severe, we might be justified in giving heed to this final plea, but, under the circumstances, we are compelled to resort to the rule that the nature of the penalty is intrusted, in the first instance, to the discretion of the trial judge, and finally, to the mercy of the Chief Executive."

We were drawn to the conclusion that possibly the penalty was too severe by the fact that much of the literature offered in evidence has been carried through the United States mails as second-class matter. Further, Boloff's offense, as described by the evidence, partook more of the nature of guilt by association than guilt by conduct. Guilt by association has not been regarded favorably in America as a means for determining an individual's worth (Freedom of Speech, Chafee, p. 262). There is a vast difference between the act of merely associating with lawbreakers and the

conduct of one who obtains a membership in a carefully organized society which teaches the commission of crime and who makes contributions of money for the furtherance of its program. Next, the crime of conspiracy, which, as we have seen, has supplied criminal syndicalism acts with their primary principles, has not fared well in the administration of justice. This branch of the criminal law may very well be described as the quicksands of the law. It too frequently is subject to the shifting public sentiment which always affects matters pertaining to government. For instance, the seven justices of the United States Supreme Court who voted to sustain the conviction of the defendants in *Abrams v. United States* (250 U. S. 616 (40 S. Ct. 17, 63 L. Ed. 1173)) are accused by Professor Chafee of the Harvard Law School of having done "a lasting injustice to the defendants" (Freedom of Speech, Chafee, p. 155), while the two dissenting justices have been sharply criticized by Dean John H. Wigmore of the Northwestern University Law School, for endeavoring to license "freedom of thuggery" (14 Illinois Law Review, 539). It must be evident that the defendant's contention does not warrant us in assuming any control over the penalty, and, since it is well settled that the imposition of the penalty rests within the exclusive discretion of the circuit court, we dismiss this phase of the case without further notice.

Having once more made a painstaking examination of the record, we find no reversible error. The defendant committed the act prohibited by the statute. It follows that the petition for a rehearing will be denied.

BROWN, CAMPBELL and KELLY, JJ., concur.

BROWN, J. (Specially concurring.) Chapter 34, Gen. Laws of Oregon, 1921, referring to criminal syndicalism, has been denounced by some as invalid, and by others as denying equal justice and contravening our constitutional guaranty against cruel and inhuman punishment. This statute was long ago determined to be constitutional: *State v. Laundy,* 103 Or. 443 (204 P. 958, 206 P. 290). It is the function of the Legislative Assembly to discern and correct evils: See Or. Const., Art. 3, § 1.

At the Third Session of the Seventy-first Congress, under House Resolution 220 a committee was created by the House of Representatives of the United States to investigate the activities and propaganda of the Communists in this country. On January 17, 1931, after holding many hearings this committee filed its report and recommendations wherein, after setting out in detail the principles and aims of communism, it is stated:

"Communism has also been defined as an organized effort to overthrow organized governments which operate contrary to the communist plan now in effect in Russia. It aims at the socialization of government, private property, industry, labor, the home, education, and religion. Its objectives are the abolition of other governments, private ownership of property, inheritance, religion, and family relations."

The report of this committee also refers to, and quotes at length from, a memorandum submitted to the United States Senate on January 21, 1924, by Hon. Charles Evans Hughes, now Chief Justice of the Supreme Court of the United States, in his then capacity of Secretary of State, and, continuing, says:

"There is a sharp distinction between the right to advocate in an academic way any doctrine we like, and the right, which is not a right under any reasonable

interpretation of our Constitution, to preach and plan the overthrow of our republican form of government by force and violence.''

. In *Whitney v. California,* 274 U. S. 357, a case relating to criminal syndicalism, Mr. Justice Brandeis, in a specially concurring opinion, wrote:

''To justify suppression of free speech, there must be reasonable ground * * * to believe that the evil to be prevented is a serious one. Every denunciation of existing law tends in some measure to increase the probability that there will be violation of it. Condonation of a breach enhances the probability. Expressions of approval add to the probability. Propagation of the criminal state of mind by teaching syndicalism increases it. Advocacy of law-breaking heightens it still further.''

Similar to our own law defining and denouncing syndicalism is the statute defining ''Unlawful Associations'' in Canada, appearing on pages 114, 115, Crankshaw's Criminal Code of Canada (5th Ed.).

In a case prosecuted at Toronto, the witness chiefly relied upon was Sergeant John Leopold, a red-coated officer of the Royal Canadian Mounted Police, who, after secretly joining the ''Unlawful Associations,'' had for seven years sat in the councils of Canadian Communists and had risen to be an official of the organization. It is reported that the prosecution offered batches of documents seized in raids on Communists headquarters, which established that the Canadian Communists were financed by money from Moscow, and that the organization had as its object the overthrow of the Canadian government by force and violence. As a result of the trial seven of the defendants received five-year and two-year sentences, to run concurrently, and the eighth a one-year and a two-year sentence, also to run concurrently. For a full discus-

sion of the case, see The Literary Digest, November 28, 1931, page 15. This occurred in the Dominion of Canada, where ancient liberties are protected, and laws are enforced.

In the case at bar, the defendant was fairly tried, adjudged guilty, and sentenced. It is obligatory upon this court to enforce the law as it is written by the law-making power. We have not the authority to modify by construction the statute under which the defendant has been convicted. Nor can we entrench upon the power of the Executive by commuting the sentence or pardoning the defendant.

While it may be asserted that the sentence of ten years in this case was severe, I am of the persuasion that the court committed no reversible error in the trial thereof. I therefore concur in the opinion prepared by Mr. Justice Rossman.

KELLY, J. (Specially concurring.) The defendant was born in Russia. He still bears allegiance to that government. For six years he was a member of the Communist Party in the United States. With such a background, his very commendable ability to excavate for sewers and his natural hesitancy in speaking our language fail to raise a question in my mind as to his knowledge of the tenets of the party mentioned. Speaking English, as a witness in his own behalf, the defendant testifies that he cannot speak English. I think that he protests too much.

The defendant is charged with maintaining a membership in an organization which teaches that civic and industrial reform should be attempted by means of force and violence. Distinguishing a spoken or written utterance from an overt act, the offense charged does not involve the question of whether or not an overt

act was committed. In this respect, it is like the offense of slander of a bank, of libel, of unlawful possession of liquor, many forms of vagrancy, soliciting for immoral purposes, and similar offenses. In other words, the question of whether an overt act was committed is not in the case.

In my opinion, therefore, in this case there are but three questions to be decided:

First. Is the statute constitutional that declares it to be a criminal offense to maintain a membership in an organization which advocates that force and violence should be employed as a means of accomplishing industrial or political ends?

Second. Was the testimony admissible which disclosed that a duly accredited member and spokesman of the organization in question, acting as such, advocated such inhibited doctrine?

Third. Should the appellate court attempt to extend clemency in the matter of punishment by reducing the sentence imposed by the circuit court?

To these three questions, I answer thus:

First. Under the overwhelming weight of authority, the first question must be answered in the affirmative. To my mind, a negative answer would indicate that this court looks with complacency, if not approval, upon a teaching inimical in the highest degree to a government ruled not by men or force, but by law. Such teaching has been advocated under many names, such as anarchy, radicalism, communism, etc. Interpreted by incontrovertibly established events of the past, in brief, that teaching is that if a law meets with your disapproval, you should kill the officer or officers whose duty it is to execute such law; if the editorial or managerial policy of a newspaper is distasteful to you, or if you have a grievance against any other industry,

you should blow up the building and plant of that newspaper or other enterprise with bombs and other explosives; when opportunity arises, you should assassinate some distinguished public servant simply as a gesture of dislike for the established order of affairs; and as soon as sufficient strength comes to your cause, a revolution should be precipitated; privately owned property should be confiscated and the outstanding members of the ruling class, who, under our form of government, are representatives of all classes, should be murdered.

Here, where ballots instead of bullets rule, in the mart of ideas, this doctrine is contraband. To advocate it, is an abuse of "the right to speak, write or print freely" which abuse is expressly proscribed by the very section of the Constitution which prohibits the restraint of such right. An assembly furthering the advocacy of such doctrine is in no sense "for the common good."

Where this doctrine has attained controlling ascendency, its first fruits are repudiation, atheism, free love, free divorce, legalized abortion, and class despotism. These are noxious and pestilential. Any attempt to import them into the United States should be frustrated.

Second. The question of whether the organization in suit advocated force and violence for the purpose mentioned being one of the issues, it follows that proof of such advocacy was admissible as pertinent and relevant to that issue.

Third. By the Constitution of Oregon, the prerogative of extending clemency to convicts is given to the Governor. I am quite content to leave it there.

I concur in the able, excellent and exhaustive opinion of Mr. Justice ROSSMAN.

BELT, J. (Dissenting.) Ten years in the penitentiary! What a price to pay for warped ideas! Who is this man Ben Boloff that he should thus be considered such a menace to society? Let the record speak.

Boloff came to this country from Europe when a boy 18 years of age and has resided almost continuously in Oregon for the past 20 years. Never before has he been convicted of any crime. He has never attended school a single day in his life and cannot read nor write. All he knows is hard work—how to dig a ditch or lay sewer pipe. In October, 1930, he came from Klamath Falls to Portland in search of work. After walking the streets for a few days looking in vain for a job, he was arrested upon a charge of vagrancy. Upon hearing, the charge was dismissed. Two days later he was arrested for having violated the Criminal Syndicalism Act and, upon failure to give a bond of $2,500, was put in jail where he has been ever since.

It may be conceded that it is within the power of the legislature to enact laws prohibiting any organization or political party from teaching or advocating crime (*Whitney v. California,* 274 U. S. 357 (47 S. Ct. 641, 71 L. Ed. 1095); *State v. Laundy,* 103 Or. 443 (204 P. 958, 206 P. 290)), but, in my opinion, it was never intended that such statutes be invoked to silence by force the complaints or criticisms, however unjust or unreasonable, made against existing social, economic, or political conditions. Even the sovereign state can not sit in judgment upon a man's conscience and dictate to him how he shall think or speak concerning such questions. Legislation is not a cure for radicalism. As a matter of fact, free expression of opinion is the best antidote for the various kinds of isms with which our body politic is afflicted. The soap box orator—

unmindful of all the blessings which a beneficent government bestows upon him—may rant and storm, but his radicalism will not take root in a nation whose people enjoy the sacred right of freedom of thought and speech.

Let it be borne in mind that the charge in the indictment is predicated solely upon the mere act of the defendant in joining the Communist Party. Aside from his membership in this organization, there is not a scintilla of evidence that he ever said or did anything to teach or advocate crime or physical violence.

Assuming the constitutionality of the Act, the record discloses error which warrants a reversal of the judgment of conviction. Defendant excepted to the refusal of the court to give the following instruction:

"The Court instructs the jury that an honest mistake on the part of one who has become a member of an unlawful organization as to its nature and purposes is a defense. Therefore I instruct you that even if you should be convinced beyond a reasonable doubt and to a moral certainty that the defendant is guilty beyond a reasonable doubt and to a moral certainty of all the material allegations in the indictment, you must then inquire as to whether the defendant made an honest mistake as to the nature and purpose of the Communist Party of the U. S. A. when he joined that organization. And if there is a reasonable doubt in your mind, from all the evidence in the case, that the defendant Ben Boloff did not honestly understand the nature and purposes of the organization he joined then it is your duty to resolve that doubt in his favor and bring in a verdict of not guilty."

Not only did the trial court refuse to give the above instruction, but explicitly instructed the jury that guilty knowledge of the defendant as to the teachings and doctrines of the Communist Party was not an es-

sential element of the offense charged in the indictment. That this instruction was erroneous and highly prejudicial to the rights of the defendant seems obvious. The trial court might well have given the instruction relative to knowledge which met with the approval of this court in *State v. Laundy,* supra. Referring to the same it was said:

"* * * the court prevented the jury from adjudging the defendant guilty of that which he could not know," citing *State v. Cox,* 91 Or. 518 (179 P. 575).

Also.see *State v. Harris,* 106 Or. 211 (211 P. 944), and *State v. LaBine,* 119 Or. 583 (250 P. 738). True, there was no exception taken to the instruction as given in the instant case, but it is believed that the requested instruction which the court refused, and to which refusal exception was taken, sufficiently presented to the court the question of knowledge. In taking cognizance of this plain error in law—regardless of the fact that counsel for defendant failed properly to preserve his record—we might well invoke Rule 12 of the Supreme Court rules, which provides:

"* * * The court reserves the right in furtherance of justice to notice on its own initiative a plain error of law apparent on the face of the record." 100 Or. 750.

After all, rules of procedure are enacted for the purpose of administering justice—not to defeat it.

Yet it is said in the majority opinion that "there was ample evidence to indicate that, after joining, the defendant must have become aware of the purposes of the organization, and as we have seen he did not deny such knowledge after the State had submitted its proof. We, therefore, conclude that the requested instruction was properly refused." Where is the evidence to justify this conclusion? Indeed, the evidence

well warrants the inference that Boloff did not know that he was joining an organization having an unlawful purpose. Consider the following portion of the record:

"Q. Now, Ben, tell the jury how you come to join the Communist Party.

"A. Well, the Communist Party is a working class organization of workers—the working class party.

"Q. How do you know it is?

"A. I know the workers that belong to it.

"Q. Then you want the jury to understand that workers told you that the Communist Party was a working man's organization; now, is that correct? Is that right?

"A. Yes, that is right.

"Q. Have you read anything about the Communist Party in the Communist papers?

"A. No.

"Q. Do you read English?

"A. No.

"Q. Did you ever hear of the materialistic conception of history?

"A. Never.

\* \* \* \* \*

"Q. Did you ever hear of the doctrine which is also known as historical materialism or economic determinism?

"A. Never have.

\* \* \* \* \*

"Q. Just explain a little further why you joined the Communist Party. \* \* \*

"A. Well, the Communist Party is a working class organization, that they try to get better conditions, and so I tried to go with them as a worker, and it was for that purpose.

\* \* \* \* \*

"Q. Well, now you are charged in the indictment with being a member of an organization which unlawfully and feloniously teaches, advocates and affirma-

tively suggests the doctrine of criminal syndicalism; what do you understand by criminal syndicalism? Criminal syndicalism.

"A. I don't know what that means; I don't know what that word means.

"Q. Do you know what syndicalism means?

"A. No, I don't.

"Q. Did you ever read anything about syndicalism?

"A. No; I never heard that word before I been in the jail.

\*　　　\*　　　\*　　　\*　　　\*

"Q. I will ask you if in your lifetime you ever committed any acts of physical violence, crime, or unlawful acts.

"A. No."

In the light of the above record it is utterly absurd that this ignorant defendant, who does not know what it is all about, will, by reason of his ideas, constitute an imminent danger to the welfare of our government. Under any view, the question of his knowledge as to the character of the Communist Party was one for the jury to determine and it cannot be said, as a matter of law, that the defendant did or did not know the nature of such organization.

In my opinion, it was also error to admit the hearsay testimony of the police officer O'Dale, relative to a speech made by one Levitt, a member of the Communist Party, tending to show that such organization advocated crime and violence. Levitt was not called as a witness and defendant had no opportunity to cross-examine him to ascertain whether, in fact, he had a true conception of the teachings and principles of the organization to which he belonged. There is no evidence that the organization ever ratified anything said by Levitt in such speech. Yet, it was all received as

against the defendant whether he believed in the same or not. The State, having shown that the defendant joined the Communist Party, apparently sought, under the theory of a conspiracy, to hold him responsible for all of the strange doctrines and teachings that any member of such organization ever advocated—whether the defendant believes in or even knows of the same. Applying the same logic, if some Democrat should go so far as to assert in a public speech that all Republicans should be shot at sunrise, then every member of the Democratic party would be guilty of crime. The doctrine of criminal conspiracy, when thus extended, leads to absurdity.

True, *State v. Pettilla,* 116 Wash. 589 (200 P. 332), apparently upholds the admission of such testimony. In that case a distinction is made between hearsay statements of individual declarations of members of an organization regarding teachings of the organization and speeches made by authorized members. The Washington court held that evidence of the first type was inadmissible as hearsay, but that the latter kind of evidence was admissible. I can see no good reason for this distinction and, furthermore, I am unable to reconcile that case with the prior holding of the court in *State v. Gibson,* 115 Wash. 512 (197 P. 611). That such testimony as received in the instant case is inadmissible see the well considered case of *State v. Dingman,* 37 Idaho 253 (219 P. 760).

But it is urged that this alleged error was not prejudicial because substantially the same evidence was received without objection. This contention was also made in the Dingman case and, in disposing of the same adversely to the State, the court said:

"It is earnestly contended that, nothwithstanding the errors committed in the admission of this hearsay

evidence there is still sufficient competent evidence to sustain the conviction, and hence such error was without prejudice. Where a conviction follows the admission of incompetent evidence, it is never possible for the court to say to what extent its admission influenced the verdict. A verdict should not be set aside for error unless it is clear that the defendant has not had a fair trial. In the instant case the jury acquitted the remaining 22 persons jointly informed against and tried with defendant, although the evidence against them was substantially the same, except that they were not shown to be organizers. In view of the highly inflammatory nature of this hearsay evidence, and the large number of witnesses who were permited to testify, and all the surrounding circumstances, it cannot be presumed that its admission was harmless. Furthermore, this court should not lend its sanction to the making of an exception disregarding and setting aside a rule of law so ancient, fundamental, and important as the rule against the admission of hearsay evidence, which would thereby make the teachings, doctrines and character of every civic, religious, or political organization the subject of attack upon its good name and character by any irresponsible person who sought to malign it. Courts are governed by the limitations and restrictions imposed by law, and they cannot in its administration sanction or uphold that which has not been done in accordance with its settled principles. If it were otherwise, they would exercise a mere autocratic power to arbitrarily uphold or set aside a conviction for crime, irrespective of the settled rules of procedure. They are not clothed with that power, but must extend to every person charged with crime the equal protection of the law.''

Being firmly convinced that there is error which warrants a reversal, I dissent from the majority opinion denying the petition for rehearing.

BEAN, C. J., and RAND, J., concur in this dissent.