Argued October 9; reversed November 26, 1935

# STATE *v.* PUGH
### (51 P. (2d) 827)

*Irvin Goodman,* of Portland, for appellant.

*George Codding,* District Attorney, of Medford (I. H. Van Winkle, Attorney General, on the brief), for the State.

RAND, J. The defendant was convicted in the circuit court for Jackson county of the crime of criminal syndicalism and sentenced to the penitentiary for the period of five years, from which judgment he has appealed.

The indictment charged that:

"The said Kyle Pugh on the 9th day of September, A. D. 1934, in the said County of Jackson, and State of Oregon, then and there being, did then and there unlawfully, feloniously and knowingly circulate, sell, distribute and publicly display books, pamphlets, documents and written and printed matter, to-wit: 'The Work in the Rural Districts, by J. Stallin; Farmers Call to Action, published by National Action Committee; On Understanding Soviet Russia, by Corliss Lamont; The Soviet Union—Your Questions Answered, by Margaret Cowl; Farm Dollar Blight, (The New Deal in Agriculture) by John Barnett; What War Means to the Workers, by Robert W. Dunn; Why Communism (Plain Talks on Vital Problems) by M. J. Olgin, re: Election Platform; Daily Worker; Western Worker and Moscow News;' the said books, pamphlets, documents and written and printed matter containing matters advocating criminal syndicalism, sabotage, crime, physical violence and unlawful acts and methods as a means of accomplishing and effecting industrial and political change and revolution, contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon."

Chapter 459, Oregon Laws, 1933, provides:

Section 1. "Criminal syndicalism hereby is defined to be the doctrine which advocates crime, physical violence, sabotage, or any unlawful acts or methods as a means of accomplishing or effecting industrial or political change or revolution."

Section 2. "Sabotage hereby is defined to be intentional and unlawful damage, injury or destruction of real or personal property."

Section 3. "Any person who, by word of mouth or writing, advocates or teaches the doctrine of criminal syndicalism, or sabotage, or who prints, publishes, edits, issues or knowingily circulates, sells, distributes or publicly displays any books, pamphlets, paper, handbill, poster, document or written or printed matter in

any form whatsoever, containing matter advocating criminal syndicalism, or sabotage, or who shall organize or help to organize, or solicit or accept any person to become a member of any society or assemblage of persons which teaches or advocates the doctrine of criminal syndicalism, or sabotage, or any person who shall orally or by writing or by printed matter call together or who shall distribute or circulate written or printed matter calling together or who shall preside at or conduct or assist in conducting any assemblage of persons, or any organization, or any society, or any group which teaches or advocates the doctrine of criminal syndicalism or sabotage is guilty of a felony and, upon conviction thereof, shall be punished by imprisonment in the state penitentiary for a term of not less than one year nor more than 10 years, or by a fine of not more than $1,000, or by both such imprisonment and fine.''

At the close of the state's case and again at the close of all the testimony, the defendant moved for a directed verdict, both of which motions were overruled and this action by the court is assigned as error.

It was contended that the act was unconstitutional in that it denies that freedom of speech guaranteed by section 8 of article I of the state constitution, which provides: ''No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write or print freely on any subject whatever, but every person shall be responsible for the abuse of this right.''

■ This contention is foreclosed by the decisions of this court in *State v. Laundy,* 103 Or. 443 (204 P. 958, 206 P. 290), and *State v. Boloff,* 138 Or. 568 (4 P. (2d) 326, 7 P. (2d) 775), in which cases it was held that the original criminal syndicalism statute, which was more stringent in its provisions than the present statute and of which the present statute is an amendment, was not

unconstitutional upon any of the grounds now urged. This question, therefore, is not now an open one.

It was also contended in the court below and upon the appeal here that the court should have directed a verdict of acquittal for the reason that the state failed to prove the material allegations of the indictment in that it failed to prove, (1) that any of the periodicals mentioned in the indictment advocated the commission of crime, physical violence, sabotage or any unlawful acts or methods as a means of accomplishing or effecting industrial or political change or revolution, and, (2) that, if any of the periodicals offended against the statute, the state failed to show that the defendant at the time he circulated and sold them to other persons had any knowledge that they did so offend.

An examination of these papers shows that many of them contain no matters which bring them within the statute but are composed wholly of arguments, statements and dogma such as are to be found in articles published in many of the periodicals circulated generally throughout the country and are merely a restatement of many of the doctrines of socialism. While such arguments may appeal to the unthinking class, they do not offend against the statute. However, some of the papers and printed matter which were enumerated in the indictment and received in evidence do advocate the bringing about of a change in our form of government not by constitutional methods but by force and violence and, for that reason, do offend against the statute. As to those containing such offensive matter, their circulation or sale, if done with knowledge of their criminal contents, would be a criminal offense under the statute. Upon the trial, all these papers were offered in evidence without any attempt

being made to segregate that which was offensive from that which was not offensive and this undoubtedly led to confusion, if not to error, upon the part of the jury.

■ The offense with which the defendant was charged was that he had knowingly circulated, sold, distributed and publicly displayed the pamphlets and writings enumerated in the indictment and that these documents advocated physical violence or sabotage as a means of accomplishing or effecting industrial or political change or revolution. In order to prove the charge thus made, it was necessary for the state to show that the defendant had not only circulated, sold, distributed or publicly displayed the offending pamphlets or writings but also that at the time he had done so he had knowledge of their criminal contents. In other words, it was not sufficient for the state to show merely that these pamphlets or writings contained offensive matter and that the defendant had circulated or sold them, but also that the defendant knew at the time he sold or circulated them that they did contain such offensive matter. The statute uses the word "knowingly" and, therefore, limits the crime to an act knowingly done in violation of the statute, and this has no reference to the circulation or sale unless such circulation or sale was done with knowledge of such facts as would bring the act of circulation or sale within the provisions of the statute. Our statute, section 14-1033, provides:

"The term 'knowingly', when so applied, imports only a knowledge that the facts exist, which bring the act or omission within the provisions of this Code, and does not require any knowledge of the unlawfulness of such act or omission."

Hence, under this statute, before the defendant could be found guilty of the crime charged, it was necessary for the state to prove that the defendant had

knowledge at the time he circulated or sold the papers in question that they contained matter which made their circulation or sale a violation of the statute.

The learned trial judge called the attention of the jury to the statute last referred to and thoroughly explained to the jury that knowledge upon the part of the defendant of the contents of the papers themselves was a necessary element to be proved before a verdict of guilty could be rendered. Hence, the question for us to determine upon this appeal is whether, in overruling the motion for a directed verdict, there was any evidence in the case which would justify the jury in finding that the defendant had such knowledge at the time he did the acts complained of in the indictment.

Upon the trial the defendant, through his attorney, frankly admitted that he had circulated and sold copies of the papers found in his possession at the time of his arrest and enumerated in the indictment. But he nowhere admitted that he had any knowlege of their contents or that they contained any matter which would bring them within the ban of the statute. His admission, as shown by the record, is as follows:

"Mr. Goodman: If your Honor please, we admit the specific literature contained in the indictment, if that will help expedite the case.

"Mr. Codding: It certainly will.

"The Court: Counsel has admitted that the defendant circulated—wait a minute—you wish it to stand as a matter of record that you admit all this (looking at indictment), that the defendant did circulate, sell, distribute and publicly display books, pamphlets, documents and written and printed matter that are alleged here?

"Mr. Goodman: No, Your Honor. We will admit that the defendant circulated the literature named in the indictment on the date contained therein; we are admitting he circulated, actually circulated but em-

phatically deny it was unlawfully and feloniously circulated.

"The Court: Do you admit it was the particular literature listed here (referring to the indictment)?

"Mr. Goodman: Yes, Your Honor."

There was no evidence offered upon the trial showing or tending to show that the defendant was a member of the communist party or that he was in sympathy with any of its doctrines. According to his testimony, he came to Josephine county two or three years before his arrest as a prospector but found nothing of value. He was unable to secure any steady employment and could not obtain relief work because he was unmarried and had no family to support. He had no possessions except one burro and a two-wheeled cart, and he was without funds. Some time in May, 1934, he commenced to receive at Grants Pass from the National Farmers' Weekly of Chicago these papers and pamphlets in question for the purpose of sale and that he sold them to various people for from five to 25 cents a copy and thereby earned a precarious living. Early in September, he took his burro and two-wheeled cart and, having these papers in his possession and no place to leave them, took them with him and started for Butte Falls. As he passed through Central Point he exchanged some of them for a few eggs, and, when he was arrested on Sunday morning, September 9, 1934, by Mr. Joe Folsom, a state police officer, the defendant was camping by the roadside near Medford. There was no evidence upon the defendant's part that he ever read any of the articles contained in any of these publications. Mr. Joe Folsom, the arresting officer, testified as follows:

"Q. Mr. Folsom, how was this defendant traveling? A. He was driving a burro and cart—a two-wheeled

cart. Q. Did you have any conversation with the defendant about the time of his arrest there as to where he obtained this literature? A. I did. Q. What was that? A. I had quite a conversation with him in regards to where he was from and where he was going and in regards to these pamphlets and papers and other stuff that he had in his possession, and he stated that he had got it and was selling it to make his living en route to Medford, and also that he was going to Klamath Falls and into the potato fields. Q. Where did he say—where did he say he got it? A. He got it through the mail; it had been shipped to him; he said that he was selling it to the orchardists, he was going to work in the orchards here and going from here to Klamath Falls into the potato fields. Q. What did you do—place the defendant under arrest at that time. A. I did, yes sir. Q. Then what did you do? A. I took him along with the pamphlets and papers to the state police headquarters in the Medford City hall. Q. Did you have any conversation with him with reference to the kind of literature this was? A. I did; we talked about it. I asked him what he was going to do with it and he said 'Sell it', and he said where he couldn't sell it he would give it to them. He said he got from five cents to twenty-five cents for it and had sold some at Central Point to purchase some eggs. I asked him how much money he had and at the time we searched him he had a few pennies—a nickle I believe. Q. Did you have any conversation with reference to the contents of this stuff, whether or not it should be distributed? A. Yes, I did and he stated if I knew what was in that book I would be a damned smart man."

Captain Lee M. Bown, another state police officer, testified as follows:

"Q. Did you have any conversation with him relative to certain literature, books, pamphlets, papers and so on that were in his possession? A. At my arrival at the office, having been called there by Officer Folsom—when I arrived the defendant was there and there was also considerable literature, some pamphlets in pam-

phlet form and some in sealed envelopes which had been received by express, packages in uniform envelopes, and I asked the defendant what he was doing with this literature and he stated he was selling it. I asked him what for and he said to make a living. I wanted to know if he had sold any of it and he said 'Yes'. Considerable different conversation was held with reference to some personal effects and as to where the defendant was from, his name, and also with reference to the literature as to where he had got it. I picked up a package that had come by express and noticed it was from New York, and I asked him why he received it by express and I said: 'Why do you receive it by express and not through the mail?', and he said 'They can't send it by mail'. I also asked him if he didn't know it was communistic literature and was against the government and he stated if I knew the government was wrong I would try to right it wouldn't I. Also I asked him if he was so fond of Russia and that form of government why he didn't buy a one-way ticket and go back to Russia and stay there. He stated the people needed to learn. Q. That the people needed to learn? A. Needed to learn. We also had other conversations with reference to participation in the bonus army. He had a paper identifying him with the bonus march in Washington, D. C., and we had some talk as to his army experience. Q. Did you have any conversation relative to his reading this literature himself? A. Yes, I asked him if anyone ever read it and he said they did. I asked him if he had read it and he said yes, and he also informed me if I would read it I probably would learn something.''

On cross-examination, Captain Bown testified:

''Q. You testified on direct examination that the first time that you had ever seen this defendant was on Sunday, September the 9th this year? A. To my knowledge, that is the first time I had ever seen him. Q. And at the time you first saw him you had a conversation with him in which you asked him if he knew that he was selling communistic literature and if he knew communistic literature was against the government—was

that what you asked him? A. No, sir. I asked him if he knew the contents of the literature and if he knew it was against the government. He told me if I knew the government was wrong I would try to right it, wouldn't I?''

■ Even if it should be assumed that knowledge of the criminal contents of these writings could be inferred from these extra-judicial admissions of the defendant, yet, in the absence of other evidence of such knowledge upon the defendant's part, they are not sufficient, for, if considered as admissions, they do not admit knowledge of the criminal contents of any of these papers and if considered as confessions, they are not sufficient for section 13-932, Oregon Code 1930, provides: ''* * * nor is a confession only sufficient to warrant his conviction, without some other proof that the crime has been committed.'' And since the crime could not be committed unless there was such knowledge, the evidence referred to was not sufficient to warrant his conviction. See *State v. Elwell*, 105 Or. 282 (209 P. 616).

In this connection it should be noted that the statute does not make the possession of these papers, nor the circulation or sale of them, unless knowingly done, sufficient to warrant a conviction.

We, therefore, are constrained to hold that defendant's motion for a directed verdict should have been granted since there is nothing in the record, outside of the admissions referred to, tending to prove the defendant's guilt.

The judgment will, therefore, be reversed and the cause be remanded with directions to dismiss the charge, and it is so ordered.

BEAN, BELT and ROSSMAN, JJ., concur.

KELLY, J. (dissenting). As the writer understands the record, there was a judicial admission by defendant, through his counsel, during the trial, that the defendant had distributed the literature described in the indictment. The defendant testified that from about May, 1934, to September 9, 1934, he was engaged in selling this literature. He also testified that before leaving school he had attained the eighth grade. The literature is of the character inhibited by the statute and there is nothing in the record to the effect that any other or different character of literaure was handled, distributed or sold by him.

In defendant's testimony, there is no denial that he knew the contents of the literature in suit or that he told the officer that he had read it, or that, when he could not sell it, he distributed it gratuitously.

Where, as in the case at bar, the defendant voluntarily goes upon the witness stand, his failure to deny prominent and damaging facts of which he has personal knowledge may be considered: Underhill's Criminal Evidence (4th Ed.) section 147, and authorities cited in note 86.

The case of *Stover v. People,* 56 N. Y. 315, is among the cases there cited. In that case, the defendant was accused of larceny of about $250. The court charged the jury that they were entitled to consider as a circumstance, the failure of accused while a witness to give any account as to where the money found upon him had been kept in the interval from the time he claimed to have received it until it was so found. The writer ventures to quote the concluding lines of the opinion:

"True, it is at the option of the accused whether or not to become a witness. When he has exercised this and become a witness he is made competent for all purposes in the case; if by his own testimony he can ex-

plain and rebut a fact tending to show his guilt, if innocent, and he fails to do so, the same presumption arises from his failure that would arise from a failure to give the explanation by another witness, if in his power so to give it. The reason for the presumption is alike in both cases. It arises from the known desire of parties to repel or explain accusatory evidence against them, if in their power; and the basis of the presumption is that the case shows that it is in their power if innocent. Hence a failure tends to show an absence of innocence. There is no foundation for the argument of counsel that the accused was surprised by the application of the rule to his case. It had been proved by the prosecution that the accused said that he could not give an account as to where the money was kept.''

The case of *State v. Elwell,* 105 Or. 282 (209 P. 616), is a case wherein the defendant was charged with the crime of arson. It is distinguishable from the case at bar because, as shown in the dissenting opinion therein, the defendant repudiated all of his confession relating to the manner in which the fire started. In the case at bar, there is no suggestion in the record that the incriminating part of the literature, handled, distributed and sold by defendant, had not been read by him. The admission of defendant is that he had read said literature.

In what he has said thus far, the writer has treated the case as if this court had adopted the rule that a defendant can not be convicted on proof of his extrajudicial admissions in absence of corroborating circumstances tending to show the commission of the offense charged. The writer has no aversion of that principle of criminal evidence. Among the authorities declaring it are: Underhill's Criminal Evidence (4th Ed.), § 262, authorities cited in notes 50 and 51; *Martin v. United States,* 264 Fed. 950; *People v. DeMartini,* 50 Cal. App. 109 (194 P. 506); *People v. LaRue,* 62 Cal. App. 276

(216 P. 627); *People v. Johnson,* 73 Cal. App. 214 (238 P. 814); *State v. Norman,* 190 Iowa, 472 (180 N. W. 151); *Konopisos v. State,* 26 Wyo. 350 (185 P. 355); *State v. Bestolas,* 155 Wash. 212 (283 P. 687); *People v. Rodarte,* 74 Cal. App. 636 (241 P. 406); Wharton's Criminal Evidence (9th Ed.), §§ 632, 633; *People v. Chadwick,* 4 Cal. App. 63 (87 P. 384); *People v. Rowland,* 12 Cal. App. 6 (106 P. 428); *People v. Saunders,* 13 Cal. App. 743 (110 P. 825); *People v. Jones,* 31 Cal. 565; *Smith v. State,* 17 Neb. 358 (22 N. W. 780).

Where this rule is applied, it is also generally held that slight corroborating facts are sufficient: *People v. Bagley,* 16 Wend. (N. Y.) 53; *State v. Keller,* 8 Idaho, 699 (70 P. 1051); *State v. Wilson,* 51 Idaho, 659 (9 P. (2d) 497).

In at least one case in Oregon, the defendant did not invoke, and this court did not apply the rule requiring corroboration of defendant's extra-judicial admissions: *State v. Fisher,* 132 Or. 693 (288 P. 215). In that case, the defendant was charged with the possession of an unregistered "worm and still set up for the purpose of manufacturing intoxicating liquor", etc. None of the witnesses who testified in that case had ever seen the still with what is termed a dome on it. Without a dome, the still could not be operated so as to manufacture liquor. The defendant therein did not testify as a witness in the case. On appeal the case was heard in banc; and, speaking through Mr. Chief Justice CosHow, this court said:

"The admission that he (the defendant) had run off liquor with the still was some evidence that the still was, either then, or had been within a few days prior thereto, set up as defined by section", etc.

A similar course is reflected in the following cases: *Murray v. State,* 198 Ind. 389 (153 N. E. 773); *Scho-*

*field v. State,* 89 Ind. App. 27 (165 N. E. 558) ; *Gatti v. United States,* 35 Fed. (2d) 959; *Wiggins v. United States,* 272 Fed. 41.

In *State v. Estes,* 49 S. D. 364 (207 N. W. 160), the court sustained a conviction because defendant had not moved to strike the evidence of his uncorroborated admission.

The writer believes that opportunity, inclination and ability on defendant's part to learn the character of said literature has been shown; and that this, coupled with his failure to deny knowledge thereof, is sufficient corroboration of defendant's extra-judicial admission that he had read it to require the submission to the jury of the question of defendant's guilt.

The writer thinks that where it is shown that defendant read the literature, the court is not warranted in holding as a matter of law that defendant read only part of it and that the part which he read was not incriminating. In this regard, the writer does not intend to say that the jury, as triers of the facts, are to be restricted in their conclusion in that regard.

These reasons prompt the writer to dissent.

CAMPBELL, C. J., and BAILEY, J., concur in this dissent.